**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**
_____

**CITY OF BATON ROUGE/**
**EAST BATON ROUGE PARISH,**
**CONSOLIDATED PARISH EMPLOYEES**
**RETIREMENT SYSTEM and**
**POLICE GUARANTY FUND,**

       **Plaintiffs,**

**v.**                                **Case No. 3:19-cv-00725 SDD RLB**

**BANK OF AMERICA, N.A. individually and**
**d/b/a BANC OF AMERICA SECURITIES,**
**BARCLAYS BANK, PLC; BARCLAYS CAPITAL INC.**
**BNP PARIBAS SECURITIES CORP.; CITIGROUP**
**GLOBAL MARKETS INC.; CREDIT SUISSE AG;**
**CREDIT SUISSE SECURITIES (USA) LLC;**
**WELLS FARGO BANK, NA.,  CAPITAL ONE BANK,**
**GOLDMAN SACHS & CO. LLC; ; J. P. MORGAN**
**CHASE BANK, N.A.; J. P. MORGAN**
**SECURITIES LLC; MERRILL LYNCH,**
**MORGAN KEEGAN/Raymond James, STIFEL**
**NICHOLAS & CO., UBS SECURITIES LLC;**
**NOMURA SECURITIES INTERNATIONAL, INC.,**
**SG AMERICAS SECURITIES, LLC.,**
**CANTOR FITZGERALD, HSBC SECURITIES USA,**
**MORGAN STANLEY & CO.,  LLC., TD SECURITIES, LLC.,**
**And UNNAMED COCONSPIRATORS**

       **Defendants.**
_____

**FIRST AMENDED COMPLAINT FOR DAMAGES**
**PURSUANT TO THE SHERMAN ANTITRUST ACT, THE LOUISIANA UNFAIR**
**TRADE PRACTICES ACT AND FOR PROFESSIONAL NEGLIGENCE**
_____

      COMES NOW THE PLAINTIFF, CITY OF BATON ROUGE/EAST BATON ROUGE

PARISH, CPERS and THE POLICE GUARANTY FUND, by and through undersigned counsel

of record, who complains upon knowledge as to its own acts and upon information and belief as to

all other matters, against Defendants (defined below) for their violations of law from at least January 1, 2009 through January 1, 2016 as follows:

## I. INTRODUCTION

1.      The City of Baton Rouge/East Baton Rouge Parish is a political subdivision of the State of Louisiana. The Consolidated Parish Employees Retirement System ( hereinafter referred to as CPERS) is a pension fund operated by the City of Baton Rouge consolidated government. It is authorized to invest revenues in direct Treasury obligations, government agency obligations, corporate bonds, perfected repurchase agreements, and reverse repurchase agreements, time certificates of deposit in specified banks, savings accounts or shares of certain savings and loan associations and savings banks, or in share accounts and share certificate accounts of certain credit unions. State statutes and investment policies limit the State Treasury investments to government securities with explicit guarantees by the U.S. government, agency securities with implicit U.S. government guarantees, and corporate securities with investment grade ratings by Moody's and S&P. As a result of this policy, the City of Baton Rouge and CPERS has historically invested in securities issued by Federal National Mortgage Association (Fannie Mae, or FNMA), Federal Home Loan Bank (FHLB) and the Federal Home Loan Mortgage Corporation (Freddie Mac).

2.      During the period of time between 2009 and 2016, the City of Baton Rouge, the Police Guaranty Fund and CPERS have invested tens of millions of dollars in Fannie Mae, Federal Home Loan Bank and Freddie Mac bonds (hereinafter referred to as "FFB's"). It has bought, sold or held to maturity over *$500 Million Dollars* in face value of these securities. It has contracted with the broker defendants sued in this case for many of those transactions.

3.      The Consolidated Government of the City of Baton/East Baton Rouge Parish, CPERS and the Police Guaranty Fund file this case due to an evident conspiracy by all Defendants

to fix the prices of unsecured debt issued by government sponsored entities ("GSEs"), including the Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac"), Federal Farm Credit Banks ("FFCB"), and Federal Home Loan Banks ("FHLB") (collectively, "GSE Bonds"). Direct evidence provided by a cooperating co-conspirator confirms the agreement and economic analysis details pricing patterns consistent with such behavior.

4.       Defendants are horizontal competitors in the GSE Bond market. Between 2009 and 2016, Defendants were the largest underwriters in the primary market involved in the process that GSEs use to issue debt (the "GSE Issuance Process") and the largest dealers of GSE Bonds to investors in the secondary market. This gave Defendants control over the GSE Bond supply ultimately available to investors and thus the prices of those bonds.

5.       In June 2018, reports emerged that the U.S. Department of Justice Antitrust Division ("DOJ") was investigating price-fixing in the secondary market for GSE Bonds. There has now been disclosed direct evidence of a conspiracy among major GSE Bond dealers to fix the prices of GSE Bonds traded in the secondary market Between 2009 and 2016. This direct evidence of conspiracy shows that Defendants inflated the prices of newly issued GSE Bonds acquired through the GSE Issuance Process throughout the time period between 2009 and 2016 by fixing the price those bonds were "free to trade" ("FTT") in the secondary market at artificially higher, anticompetitive levels. This direct evidence of price fixing has been identified by chat room transcripts which clearly record agreements to fix FTT prices.

**February 17, 2012**
DBSI Trader 1: how are you guys doing? we have 100mm left

Morgan Stanley Trader 1: 150mm left

BNP Securities Trader 1: I'd say free it up given the cheapening trend of FHLB

BNP Securities Trader 1: $140mm left

Morgan Stanley Trader 1: i just **don't want to create a race to the bottom** between the 3 of us, doesnt help anyone.

DBSI Trader 1: ugh this thing is a pig

DBSI Trader 1: ok im fine ftt

BNP Securities Trader 1: I agree, but also don't want to see spreads gap out, FHLB widen, and see a .50 in 2y space
DBSI Trader 1: go out ftt 99.985?

BNP Securities Trader 1: Good by me.

Morgan Stanley Trader 1: sure ftt at 99.985

6.       The Plaintiff is now aware that Deutsche Bank, a cooperating co-conspirator has disclosed examples, like the one above, in which Defendants and other GSE Bond dealers agreed to inflate and/or maintain artificial prices for GSE Bonds throughout the Time period between 2009 and 2016. Among those directly implicated in conspiratorial multi-bank chats regarding pricing in the secondary market for GSE Bonds are Defendants Barclays, Bank of America/Merrill Lynch, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, BNP Paribas, First Tennessee, TD Securities, Morgan Stanley, Nomura, JPMorgan, Cantor Fitzgerald, UBS, and HSBC.

7.       Defendants' unlawful agreement exploited both the structure of the vast over-the-counter ("OTC") secondary market for GSE Bonds and the lack of systems and controls in place Between 2009 and 2016 to detect such misconduct. Unlike stocks, which trade on a national exchange at publicly visible prices, investors looking to buy or sell GSE Bonds in the OTC market must typically communicate directly with a salesperson or trader to request a price quote. Prices are given individually by dealers in response to such requests made by phone or in electronic chats, making the process of pricing a GSE Bond slow and opaque compared to exchange-based markets, like the stock market, where a multitude of banks and investors and other agents can see price information updated in real-time as they trade. This opaque structure supported Defendants' agreement to unlawfully increase their own profits at the expense of the City of Baton Rouge and

CPERS by fixing the prices of GSE Bonds.

8.      Defendants expressly recognized that they stood to profit more by agreeing not to compete in the GSE Bond market. Morgan Stanley Trader 1 – the same individual concerned with creating "a race to the bottom" among Defendants in Paragraph 3 – summarized the conspiracy's philosophy in a group chat with traders from DBSI and HSBC Securities shortly before going FTT on October 25, 2013:

> October 25, 2013
> Morgan Stanley Trader 1: i dont get it. why try to compete when theres
> no need to make it competitive
>
> Morgan Stanley Trader 1: everyone can do so much better, for
> themselves and collectively if we all just play nice
>
> DBSI Trader 2: you sound like a european socialist
>
> HSBC Securities Trader 1: ha!

9.      In line with the information provided by Deutsche Bank, economic analyses show pricing patterns consistent with an agreement among Defendants to charge supra-competitive prices for GSE Bonds throughout the time period between 2009 and 2016. Plaintiffs analyzed pricing data for over 13,117 GSE Bonds encompassing a total of 1.6 million GSE Bond transactions and found several unique patterns.

10.     *First*, economic analysis shows that Defendants consistently charged investors higher prices for newly issued GSE Bonds in the secondary market following GSE Bond issuances. Inflating prices after GSE Bond issuances was lucrative for Defendants because a significantly larger volume of GSE Bond sales occur in the week following a GSE Bond issuance compared to later periods. Consequently, each Defendant had the common motive to inflate the prices of these products by charging agreed-upon, supra-competitive prices to investors. This practice stabilized prices at which newly issued GSE Bonds were sold in the secondary market at supra-competitive

levels, securing higher profits for Defendants at the direct expense of investors like Plaintiffs.

11.      *Second*, economic analysis shows that the prices of the most recently issued GSE Bonds consistently increased in the days before each new issuance.  These observed price increases are unexplained by other market factors and are, in fact, the opposite of what is expected in a competitive market. Consistent with Defendants' conspiracy to inflate the prices of GSE Bonds following new issuances, the observed price increases indicate that Defendants drove the market price for the latest set of GSE Bonds artificially higher just before new issuances to support the inflated FTT prices they agreed to fix for newly issued GSE Bonds.

12.      *Finally*, Defendants' conspiracy resulted in artificially wider bid-ask spreads in the GSE Bond market. Economic analysis shows that Defendants' agreement not to compete in the secondary market caused bid-ask spreads to artificially widen throughout the Time period between 2009 and 2016. This is highlighted by the statistically significant, and otherwise unexplained, narrowing of bid-ask spreads observed in the GSE Bond market after the Time period between 2009 and 2016. The inflation of bid-ask spreads Between 2009 and 2016 caused Plaintiffs and the Class to pay more and receive less than they should have in each GSE Bond transaction, increasing Defendants' profits at their expense.

13.      The observed inflation in GSE Bond prices and widening of the bid-ask spreads is also inconsistent with the overall trend towards electronic trading and price reporting in the GSE Bond market Between 2009 and 2016. For example, at least as early as 2010, FINRA required its members to report all secondary market GSE Bond transactions to its Trade Reporting and Compliance Engine ("TRACE"), which provides post-trade price information to the public. Academic studies show that in an OTC market (such as the one for GSE Bonds) the increased transparency supposedly created by TRACE should have resulted in a decline in investor trading

costs, *i.e.*, narrower bid-ask spreads, the exact opposite of what happened here.

14.    The economic fingerprints that Defendants' conspiracy left on the GSE Bond market diminish after January 2016, when the cooperating co-conspirator discovered the anticompetitive conduct alleged herein.  As the cooperating co-conspirator explained, Defendants' GSE Bond price-fixing conspiracy was able to persist through the earlier government investigations into the LIBOR and FX rate manipulations because the ban on multi-bank chat rooms adopted as a result of these investigations – which found that traders used electronic chatrooms to fix prices, share proprietary trading and customer order information, and manipulate pricing benchmarks – provided certain exceptions for banks involved in syndicates, like those used to underwrite and bring GSE Bonds to market. **As a result, traders involved in GSE Bond syndicates of the Defendants were allowed to participate in multi-bank chat rooms to discuss pricing even though such conduct was prohibited among traders of different products at the same bank**. The example chats included in this Complaint show that Defendants' traders exploited this loophole by using multi-bank chat rooms to unlawfully fix prices of GSE Bonds in the secondary market.  The City of Baton Rouge and CPERS entered into a multi-state settlement with Deutsche Bank in October 2017 to resolve the LIBOR price fixing claims against it, and therefore the conduct of these Defendants is particularly egregious as these selfsame defendants have acted in bad faith to exploit this exception in that settlement.

15.    Defendants' agreement to restrain trade in the GSE Bond market is but the latest instance of collusion and price-fixing in financial markets by these same Defendants. Extensive government findings show that Defendants maintained deficient compliance and oversight programs in their trading and sales businesses, and instead encouraged traders to participate in chat rooms with their competitors. That Defendants' "meetings" in the electronic chat rooms lead to

increased costs to the City of Baton Rouge and CPERS during the time period in question is an entirely predictable result. Given the persistent, pervasive, and secret nature of Defendants' conspiracy, as well as the existence of ongoing governmental investigations into the misconduct alleged herein, Plaintiffs believe that additional evidentiary support for their claims will be unearthed in discovery.

## II.  JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, respectively, and pursuant to 28 U.S.C. §1331.

17.    Venue is proper in this District, pursuant to, among other statutes, Sections 4, 12, and 16 of the Clayton Act; 15 U.S.C. §§15, 22, and 26; and 28 U.S.C. §1391(b), (c) and (d).  During 2009 to 2016, each Defendant either resided, transacted business, was found, or had agents in the District; a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, as more particularly alleged in Part VI., below. For example, Defendants Barclays Capital Inc., Wells Fargo Bank, Capital One, Merrill Lynch, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities, Inc., Goldman Sachs & Co. LLC, J. P. Morgan Securities LLC, Morgan Stanley & Co., LLC; BNP Paribas Securities Corp., TD Securities (USA) LLC, Nomura Securities International, Inc., Cantor Fitzgerald & Co., HSBC Securities (USA) Inc., SG Americas Securities LLC, and UBS Securities LLC are headquartered in this District. Defendants First Tennessee Bank, National Association and FTN Financial Securities Corp. conduct business in this District through their subsidiaries as agents and through branch offices located in this District, as more particularly alleged below.

Although all of Defendants' GSE Bonds trading desks are located in the United States, with the majority located in New York, New York, each Defendant committed acts which affected the Treasury of the City of Baton Rouge and CPERS and knowingly defrauded the City of Baton Rouge and CPERS in this District (The plaintiff would note that Defendant First TN and Morgan Keegan have headquarters in Memphis, Tennessee, outside of this District, although it affected commerce within this District).  Without exception each Defendant knew that they were taking money from the City of Baton Rouge and CPERS, that its funds were deposited in this State, that the money used for the transactions came from this State and that the persons with whom they interacted for the sale and purchase of FFBs were within the City of Baton Rouge and CPERS.

18. This Court has personal jurisdiction over each Defendant. Defendants are all domestic corporations with their principal place of business in the United States.  As alleged below, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and the United States.  Defendants conspired to fix the prices of GSE Bonds that Defendants traded in this District and with customers located in the City of Baton Rouge. Defendants' price-fixing conspiracy harmed the City of Baton Rouge and CPERS in this District by causing it to pay more for its GSE Bond purchases and receive less on its GSE Bond sales than it would have in a competitive market.

19. Defendants, either themselves or through their subsidiaries as agents, purposefully availed themselves of doing GSE Bond business in the United States and in this District by, *inter alia*: (a) enacting their conspiracy here by charging artificial, agreed-upon prices in GSE Bond transactions with investors in this District and throughout the United States; and (b) collecting unlawful overcharges from City of Baton Rouge and CPERS in this District and throughout the United States.

### III. PARTIES

20.      Plaintiffs are 1) the City of Baton Rouge, 2) the Police Guaranty Fund and 3) CPERS.  The existence of the City and Parish of Baton Rouge as well as CPERS and the Police Guaranty Fund are authorized by Louisiana State Law.   Due to their perceived safety and high credit quality, GSE Bonds have been a key component of the City of Baton Rouge and CPERS's investment policy for many years. The City of Baton Rouge and CPERS transacted more than $500 million dollars in FFBs during the period between 2009 and 2016.

21.      Throughout 2009-2016, the City of Baton Rouge and CPERS Treasury and component units participated in thousands of GSE Bond transactions, including directly with some of the Defendants such as Wells Fargo Bank, N.A., Capital One, Banc of America Securities, Morgan Keegan and Stifel.  Defendants who participated in the price fixing conspiracy which affected the amounts the Plaintiffs paid for FFBs are Barclays Capital, Inc.; Merrill Lynch, BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; First Tennessee Bank, N.A.; FTN Financial Securities Corp.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; UBS Securities LLC, Cantor Fitzgerald & Co., Morgan Stanley & Co., LLC, HSBC Securities (USA) LLC, TD Securities (USA) LLC; Nomura Securities International; and SG Americas Securities LLC. These transactions include GSE Bonds that the cooperating co-conspirator has specifically identified as being impacted by the conspiracy. As a result, Baton Rouge, CPERS and the Police Guaranty Fund suffered monetary losses and antitrust injury when they were overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix the prices of GSE Bonds.

22.      **Barclays**: Defendant Barclays Capital Inc. ("BCI") is a wholly owned subsidiary of Barclays Bank PLC, incorporated in the state of Connecticut, with its headquarters in New York,

New York and domestic branch offices in at least 15 other U.S. cities. BCI is the main U.S. broker-dealer entity for the Barclays group of entities and is a U.S. registered securities broker-dealer with the SEC; a futures commission merchant, a commodity pool operator, a commodity trading advisor registered with the Commodity Futures Trading Commission ("CFTC"); and a municipal advisor registered with the SEC. BCI is registered as a "4(k)(4)(E)" securities subsidiary under the Bank Holding Company Act, which permits it to engage in securities underwriting, dealing, and market-making activities.

23.     Barclays Bank PLC, operating under the trade name "Barclays Investment Bank," is headquartered in London, England and provides investment banking advisory services, foreign exchange securities lending, and loan syndication services through at least three offices in the United States. Barclays Bank PLC's macro market line of business is supported by trading desks that specialize in dealing GSE Bonds. Barclays Bank PLC is a direct, wholly owned subsidiary of Barclays PLC, a multinational financial services corporation.

24.     BCI's activities include transactions in asset-backed securities, agency mortgage-backed securities, debt securities, other corporate related securities, equities, resale and repurchase agreements, securities lending and borrowing, and clearing derivative products. It is an approved dealer for Fannie Mae, Freddie Mac, FHLB, and FFCB, providing BCI access to GSE Bond supply through the GSE Issuance Process. As of December 31, 2017, BCI held $8.5 billion in agency securities, a category that includes GSE Bonds.1 Between 2009 and 2016, BCI employees located in this District priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

25.     During the period between 2009 and 2016, Louisiana transacted in GSE Bonds

---

1 The terms "agency securities" and "agency bonds" are catch-all terms sometimes used to refer to debt instruments issued by agencies of the United States Federal government and entities sponsored by the Federal government, like Fannie Mae and Freddie Mac. These terms include GSE Bonds

directly with BCI.

26.     BCI performed its GSE Bond business in the United States and in this District.

27.     BCI conducts GSE-related activities, including GSE Bond dealing with investors, as part of Barclays Bank PLC's "Barclays Investment Bank" division. Barclays Investment Bank (which includes both Barclays Bank PLC and BCI) maintains a website in the United States where it advertises that "We serve our institutional investor clients by helping them to understand developments in global markets and offering execution and risk management tools across each major asset class." One of the ways in which BCI serves its institutional investor clients is by transacting in GSE Bonds with investors like Plaintiffs. Barclays Investment Bank "integrates our primary offering capabilities on behalf of issuer clients (*e.g.*, BCI's GSE Bond underwriting activities in the GSE Issuance Process) with *our* secondary trading capabilities on behalf of *our* investor clients (*e.g.*, BCI's GSE Bond transactions with investors including Plaintiffs and the Class)" (emphasis added). These allegations show that BCI transacted in GSE Bonds in the United States.

28.     **Bank of America/Merrill Lynch**: Defendant Bank of America ( d/b/a Banc of America Securities), also its subsidiary, Merrill Lynch, Pierce, Fenner, & Smith, Inc. ("Merrill Lynch") is a wholly owned indirect subsidiary of Bank of America Corporation and a corporate affiliate of Bank of America, N.A. ("BANA"). Merrill Lynch is incorporated in Delaware, with its principal place of business in New York, New York. Merrill Lynch acts as a broker and a dealer in the purchase and sale of various financial instruments, including GSE Bonds throughout the United States and in this District. It provides underwriting services and is registered as a broker-dealer and investment advisor with the SEC. Merrill Lynch and Banc of America Securities are primary broker-dealers for the Bank of America Corporation

corporate family, including BANA, and prices, markets, and sells GSE Bonds on behalf of BANA.

29.     BANA is an American global bank and financial services company incorporated in Delaware and headquartered in Charlotte, North Carolina with operations in all 50 states.  Bank of America Corporation, the parent company of BANA, completed its purchase of Defendant Merrill Lynch on January 1, 2008 and continued operating its debt and equity underwriting sales and trading business after that date by merging Merrill Lynch with Bank of America Corporation's former broker-dealer subsidiary, Banc of America Securities LLC. Bank of America Corporation also assumed all liabilities and obligations of Merrill Lynch on October 1, 2013.

30.     In 2008, with the support of the New York Federal Reserve Bank, Merrill Lynch was sold to Bank of America for $50 billion, at $29 per share. The investment firm had more than $1.02 trillion in assets and more than 60,000 employees worldwide. Bank of America became more universal once it acquired Merrill Lynch. The entire transaction took place in the panic when Lehman Brothers was about to declare bankruptcy.  As a result of this sale, Bank of America became the controlling entity over Merrill Lynch.

31.     Bank of America exerts complete control over Merrill Lynch, because it controls every act committed by Merrill.  It stated specifically in its press release regarding the acquisition of Merrill Lynch that "..We created this new organization because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking," said Bank of America Chairman and Chief Executive Officer Ken Lewis. "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."[2] Another marker of its complete control of Merrill was that it caused all shareholders of Merrill

---

[2] http://investor.bankofamerica.com/node/15396/pdf

Lynch received .8595 shares of Bank of America common stock for each common share of Merrill Lynch.3  This was a term of the merger agreement signed by Bank of America.  In addition, Merrill Lynch admits that it is clearly nothing other than a subsidiary of Bank of America.  On Merrill's website, it clearly notes that References to "Merrill Lynch" are references to any company in the Merrill Lynch, Pierce, Fenner & Smith Incorporated group of companies, which are wholly owned by Bank of America Corporation.4

32.        Finally, Bank of America has routinely acted as the master in the master-servant relationship with Merrill Lynch.  It routinely answers for the acts of its agent Merrill Lynch by paying its settlements for wrongdoing.5  The most specific example of Bank of America acting as the master which answers for the wrongs of Merrill Lynch, is the fact that Bank of America paid a $16.65 Billion Dollar settlement with  U.S. Attorney General Eric Holder and the Department of Justice - the largest civil settlement with a single entity in American history ––– to resolve federal and state claims against Bank of America and its former and current subsidiaries, including Countrywide Financial Corporation and Merrill Lynch. As part of this global resolution, the bank has agreed to pay a $5 billion penalty under the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) – the largest FIRREA penalty ever – and provide billions of dollars of relief to struggling homeowners, including funds that will help defray tax liability as a result of mortgage modification, forbearance or forgiveness. The settlement does not release individuals from civil charges, nor does it absolve Bank of America, its current or former subsidiaries and affiliates or any individuals from potential criminal prosecution.6  Bank of America also agreed to

---

3 Id.
4 https://www.ml.com/legal.html
5 Blum et al v. Merrill Lynch & Co et al, U.S. District Court, Southern District of New York, No. 15-01636; and Reiburn et al v. Merrill Lynch & Co et al in the same court, No. 15-02960.
6 https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading

pay the remaining $7 billion in the form of relief to aid hundreds of thousands of consumers harmed by the financial crisis precipitated by the unlawful conduct of Bank of America, Merrill Lynch and Countrywide.[7]

33.    Bank of America Corporation reports its financial position on a consolidated basis, which includes the activities of both BANA and Merrill Lynch. As of December 31, 2017, Bank of America Corporation held over $440 billion in debt securities, including GSE Bonds. During all times material herein, Bank of America Corporation performed investment banking activities, including dealing GSE Bonds to investors, through its wholly owned subsidiary Merrill Lynch.

34.    At all times material herein, City of Baton Rouge, CPERS and the Police Guaranty Fund transacted in GSE Bonds directly with Defendants Merrill Lynch and/or Banc of America Securities.

35.    As of December 31, 2017, Merrill Lynch held over $440 billion in U.S. Treasury and government agency securities, a category that includes GSE Bonds.  Merrill Lynch and BANA were approved dealers for Fannie Mae, Freddie Mac, FHLB, and FFCB throughout the Time period between 2009 and 2016.

36.    Bank of America Corporation is responsible for internal controls, compliance, and oversight for both BANA and Merrill Lynch. It handles "Fixed Income Compliance," which includes monitoring and detecting unlawful conduct within Merrill Lynch's and BANA's sales and trading businesses, including Merrill Lynch's and BANA's GSE Bond dealing activities.

37.    **Citi**: Citigroup, Inc. is a global banking institution headquartered in New York, New York. It is the ultimate parent of its wholly owned dealer-subsidiary, Defendant Citigroup Global Markets Inc. ("CGMI").  As of December 31, 2017, Citigroup, Inc. reported that "fair value

---

[7] Id.

levels" of all "U.S. Treasury and federal agency securities" held by itself and its subsidiaries (including CGMI) was approximately $21 billion.

38.      CGMI is a New York corporation with its principal place of business in New York, New York.  CGMI has been registered with the SEC since 1960 as both an investment adviser and a broker-dealer. CGMI currently has approximately 43,000 advisory accounts and $22 billion USD in regulatory assets under management.8 Between 2009 and 2016, CGMI dealt GSE Bonds to investors, including Plaintiffs, from offices located in this District.

39.      Citigroup Inc. manages internal controls, oversight, and compliance for CGMI.  In this capacity, it is responsible for monitoring CGMI's activities and detecting violations of law, including CGMI's GSE Bond-related activities.

40.      As of June 18, 2018, CGMI reported that it has assets of approximately $17 billion in U.S. Treasury and federal agency securities (a category that includes GSE Bonds), and over $20 billion in liabilities of the same.

41.      CGMI is an approved dealer for Freddie Mac, FHLB, and FFCB.

42.      During the period relevant to this lawsuit, the Plaintiffs transacted in GSE Bonds directly from CGMI.

43.      **Credit Suisse**: Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a wholly owned subsidiary of Credit Suisse AG ("CS AG"), organized under the laws of Delaware with its principal place of business in New York, New York. CS Securities is a "Material Legal Entity" according to CS AG's latest U.S. Resolution Plan, described as the "U.S. broker dealer" and "main U.S. operating company" of CS AG. It is a U.S. registered broker-dealer, providing

---

8 The SEC defines regulatory assets under management as "securities portfolios for which you provide continuous and regular supervisory or management services."

capital raising, market making, advisory, and brokerage services. It is an underwriter, placement agent, and dealer for money market instruments, mortgage and other asset-backed securities, as well as a range of debt, equity, and other convertible securities of corporations and other issuers. Until November 2017, CS Securities was a primary dealer in U.S. government securities. In November 2017, CS Securities transitioned its primary dealer license and a substantial portion of its U.S. Government and Agency Primary Dealership, secondary market trading, and repo market making to Credit Suisse AG, New York Branch. CS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to GSE Bond dealing inventory that it used in transactions with investors.

44.    CS AG is a multinational banking and financial services company which engages in banking, finance, consultancy, and trading activities in the United States and worldwide. CS AG has a primary U.S. office located in New York, New York referred to as "Credit Suisse AG, New York Branch." Credit Suisse AG, New York Branch ("CS NY") is a legal and operational extension of CS AG in the United States and is not a separately incorporated entity. CS NY is a primary dealer in U.S. government securities and trades with the Federal Reserve Bank of New York in this District in agency debt, which includes GSE Bonds. Through its New York Branch, CS AG serves as a dealer in U.S. government and agency securities, including GSE Bonds.

45.    CS AG has direct and indirect subsidiaries based in the United States, including Defendant CS Securities. CS AG is registered to do business in New York with the New York State Department of Financial Services. As of October 2017, CS AG held over $1 billion in GSE Bonds.

46.    CS AG manages internal controls, oversight, and compliance for CS Securities. In this capacity, it is responsible for monitoring CS Securities' activities and detecting violations of

law, including CS Securities' GSE Bond dealing activities.

47.      During the time period referenced in this Complaint, the City of Baton Rouge and CPERS transacted in GSE Bonds directly from CS Securities.

48.      **Goldman Sachs**: Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a wholly owned subsidiary of Goldman Sachs Group Inc., organized under New York Law with its principal place of business in New York, New York. Goldman Sachs is a registered broker-dealer with the SEC and trades financial products in all 50 states and the District of Columbia. It is registered with the CFTC as a futures commission merchant and a swap dealer. As of December 2016, Goldman Sachs held over $44 billion in U.S. government and federal agency obligations, a category that includes GSE Bonds.

49.      Between 2009 and 2016, Goldman Sachs employed GSE Bond trading and sales staff based in the United States and in this District, who priced, marketed, and dealt GSE Bonds to investors, including Plaintiffs.

50.      Goldman Sachs Execution & Clearing, L.P. was a wholly owned subsidiary of Goldman Sachs Group, Inc. that offered trade execution and clearing services to other subsidiaries within the Goldman Sachs brand. Goldman Sachs Execution & Clearing, L.P. also executed GSE Bond trades with Plaintiffs and the City of Baton Rouge and CPERS at artificial prices Between 2009 and 2016, until it was acquired by Goldman Sachs in or around August 2017.

51.      Goldman Sachs is an approved dealer for Fannie Mae, Freddie Mac, FHLB, and FFCB, ensuring access to GSE Bond inventory.

52.      Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds directly with Defendant Goldman Sachs.

53.      **JPMorgan**: Defendant J.P. Morgan Securities LLC ("JPMS"), previously known

as J.P. Morgan Securities Inc., is a Delaware limited liability company with its headquarters in New York, New York.  It is a wholly owned and "principal" subsidiary of JPMorgan Chase & Co., which is the parent company of JP Morgan Chase Bank, National Association ("JPM NA").  JPMS is registered with the SEC as a broker-dealer and investment advisor and registered with the CFTC as a futures commission merchant. JPMS acts as a primary dealer in U.S. government securities, makes markets in GSE Bonds, and clears OTC derivative contracts in connection with its corporate affiliates' market-making and risk management activities. JPMS is an approved dealer for Fannie Mae, Freddie Mac, FHLB, and FFCB, providing access to GSE Bond inventory through the GSE Issuance Process that JPMS and its affiliates, including JPM NA, use when dealing GSE Bonds to investors. Between 2009 and 2016, JPMS dealt GSE Bonds to the City of Baton Rouge and CPERS, including Plaintiffs, from offices located in this District.

54.     JPM NA is a wholly owned "principal subsidiary" of JPMorgan Chase & Co., headquartered in New York, New York. It is a national banking association with branches in at least 23 U.S. states. As of February 2, 2018, JPM NA held over $1.7 billion in U.S. government agency and U.S. government-sponsored agency debt securities, a category that includes GSE Bonds. Between 2009 and 2016, JPM NA traded GSE Bonds with the City of Baton Rouge and CPERS from within this District.

55.     On October 1, 2016, JPMS acquired J.P. Morgan Clearing Corp., which was known as Bear Stearns Securities Corp. until October 2008. J.P. Morgan Clearing Corp. offered execution and clearing services for corporations affiliated under the "JPMorgan" brand name, and, in that capacity executed GSE Bond trades with The City of Baton Rouge and CPERS and the City of Baton Rouge and CPERS at artificial prices.

56.     JPMorgan Chase & Co. manages internal controls, oversight, and compliance for

its subsidiaries including JPM NA and JPMS. In this capacity, it is responsible for monitoring JPMorgan Chase & Co.'s Fixed Income business unit, which encompasses JPM NA's and JPMS' GSE Bond-related activities.

57.    Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds directly with Defendant JPMS.

58.    **UBS**: UBS AG is a multinational banking and financial services corporation which engages in banking, financial, advisory, and trading service activities worldwide. It is headquartered in Basel, Switzerland. UBS AG maintains several branch and representative offices in the U.S. and is registered as a swap dealer with the CFTC. UBS AG reports that it conducts securities activities in the United States primarily through UBS Securities LLC. As of October 2018, UBS AG held over $304 million in GSE Bonds.

59.    Defendant UBS Securities LLC ("UBS Securities") is an indirect, wholly owned subsidiary of UBS AG with its principal place of business in New York, New York. It is a registered broker-dealer under the Securities Exchange Act of 1934 and is a member of the New York Stock Exchange, FINRA, NASDAQ, and other principal exchanges. UBS Securities provides a full range of investment banking services, including trading and sales and prime brokerage operations.

60.    As of December 31, 2017, UBS Securities held over $5.7 billion in U.S. government and agency obligations, a category that includes GSE Bonds. UBS Securities is an approved dealer for Fannie Mae, Freddie Mac, FHLB, and FFCB ensuring access to GSE Bond inventory through the GSE Issuance Process. Between 2009 and 2016, UBS Securities priced, marketed, and dealt GSE Bonds to investors from offices located in this District.

61.    UBS AG manages internal controls, oversight, and compliance for UBS Securities.

In this capacity, it is responsible for monitoring UBS Securities' activities and detecting violations of law, including by UBS Securities' GSE Bond dealing businesses.

62.    Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds direct with Defendant UBS Securities.

63.    **BNP Paribas**: BNP Paribas S.A. ("BNPP SA") is one of the world's largest global banking organizations. It does business in 75 countries and employs over 180,000 people, including approximately 15,000 in the U.S. As of December 31, 2012, BNPP SA and its subsidiaries held approximately €69 trillion ($90 trillion) government bonds, a category that includes GSE Bonds. In the year 2012, it sold €93 trillion ($121 trillion) in government bonds, including GSE Bonds.

64.    Defendant BNP Paribas Securities Corp. ("BNP Securities") is an indirect, wholly owned subsidiary of BNPP SA, headquartered in New York, New York. BNP Securities is a registered broker-dealer with the SEC. It is BNPP SA's "main broker dealer" in the U.S., and it is its most significant subsidiary in terms of assets, revenue, head count, and capital.

65.    BNP Securities is a primary dealer in U.S. government securities and an approved dealer for Fannie Mae, Freddie Mac, FFCB, and FHLB. BNP Securities traded GSE Bonds with investors in the United States from offices located in this District Between 2009 and 2016. BNP Securities' broker-dealer business is composed overwhelmingly of highly liquid assets, including U.S. Treasury securities and agency debt (a category that includes GSE Bonds).

66.    BNPP SA manages internal controls, oversight, and compliance for BNP Securities. In this capacity, it is responsible for monitoring BNP Securities' activities and detecting violations of law, including by BNP Securities' GSE Bond dealing business.

67.    Between 2009 and 2016, The City of Baton Rouge and CPERS and IBEW 103

transacted GSE Bonds directly with Defendant BNP Securities.

68.      **TD**: Defendant TD Securities (USA) LLC ("TD Securities") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York. It is a broker-dealer registered with FINRA and the SEC, and is licensed to do business in all 50 states. TD Securities is an indirect wholly owned subsidiary of The Toronto-Dominion Bank.

69.      TD Securities is a self-acknowledged "major participant in the Fixed Income markets." Between 2009 and 2016, TD Securities made trades for tens of billions of dollars' worth of GSE Bonds.

70.      Between 2009 and 2016, TD Securities performed its GSE Bond business in the United States and in this District. Between 2009 and 2016, TD Securities employees located in this District priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

71.      Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds directly with Defendant TD Securities.

72.      **Nomura**: Defendant Nomura Securities International, Inc. ("Nomura Securities") is a corporation organized under the laws of New York, with its principal place of business in New York, New York. Nomura Securities is registered with the SEC and FINRA, and is licensed to do business in all 50 states. Nomura Securities is a wholly owned subsidiary of Nomura Holdings, Inc.

73.      Nomura Securities is an approved dealer for Freddie Mac, Fannie Mae, FHLB, and FFCB bonds.

74.      Between 2009 and 2016, Nomura Securities made trades for hundreds of billions of dollars' worth of GSE Bonds.

75.      Between 2009 and 2016, Nomura Securities performed its GSE Bond business in

the United States and in this District. Between 2009 and 2016, Nomura Securities employees located in the United States and in this District priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

76. Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds directly with Defendant Nomura Securities.

77. **HSBC**: Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York. It is an indirect wholly owned subsidiary of HSBC Holdings plc. HSBC Securities is a broker dealer registered with FINRA and the SEC, and is licensed to do business in all 50 states.

78. HSBC Securities is an approved dealer for Freddie Mac, FHLB, and FFCB. HSBC Securities advertises on its U.S. website that it offers access to GSE Bonds.

79. Between 2009 and 2016, HSBC Securities made trades for tens of billions of dollars' worth of GSE Bonds.

80. Between 2009 and 2016, HSBC Securities performed its GSE Bond business in the United States. Between 2009 and 2016, HSBC Securities employees located in the United States priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

81. Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds directly with Defendant HSBC Securities.

82. **Cantor Fitzgerald**: Defendant Cantor Fitzgerald & Co. ("Cantor Fitzgerald") is a partnership organized under the laws of New York, with its principal place of business in New York, New York. Cantor Fitzgerald is a registered broker-dealer with the SEC and FINRA, and is licensed to do business in all 50 states. Cantor Fitzgerald is a wholly owned subsidiary of Cantor Fitzgerald, L.P.

83.     Cantor Fitzgerald is an approved dealer for Freddie Mac, Fannie Mae, FHLB, and FFCB. Between 2009 and 2016, Cantor Fitzgerald made trades for tens of billions of dollars' worth of GSE Bonds.

84.     Between 2009 and 2016, Cantor Fitzgerald performed its GSE Bond business in the United States and in this District. Between 2009 and 2016, Cantor Fitzgerald employees located in this District priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

85.     Between 2009 and 2016, Plaintiffs transacted in GSE Bonds directly with Cantor Fitzgerald.

86.     **Stifel Nicholas & Co**: Defendant Stifel Nicolas & Co is an investment company organized under the laws of the State of Missouri, with its principal place of business in St. Louis, Missouri. Stifel is a registered broker-dealer with the SEC and FINRA, and is licensed to do business in all 50 states. Stifel is a wholly owned subsidiary of Stifel Financial Corporation.

87.     Stifel is an approved dealer for Freddie Mac, Fannie Mae, FHLB, and FFCB. Between 2009 and 2016, Stifel made trades for tens of billions of dollars' worth of GSE Bonds.

88.     Between 2009 and 2016, Stifel performed its GSE Bond business in the United States and in this District, specifically buying and selling bonds to the City of Baton Rouge and CPERS.

89.     **Société Générale**: Defendant SG Americas Securities, LLC ("SG Securities") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York. SG Securities is a registered broker dealer with the SEC and FINRA, and is licensed to do business in all 50 states. SG Securities is an indirect wholly owned subsidiary of Société Générale.

90.      SG Securities is an approved dealer for Freddie Mac. Between 2009 and 2016, SG Securities was an approved dealer for Fannie Mae and FHLB. Between 2009 and 2016, SG Securities made trades for billions of dollars' worth of GSE Bonds.

91.      Between 2009 and 2016, SG Securities performed its GSE Bond business in the United States and in this District. Between 2009 and 2016, SG Securities employees priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

92.      Between 2009 and 2016, The City of Baton Rouge and CPERS transacted in GSE Bonds directly with Defendant SG Securities.

93.      **Morgan Stanley**: Defendant Morgan Stanley & Co., LLC ("MS&Co."), formerly known as Morgan Stanley & Co. Inc., is an indirect wholly owned broker-dealer subsidiary of Morgan Stanley. Morgan Stanley is a global financial services firm incorporated in Delaware and headquartered in New York, New York. As of December 31, 2017, Morgan Stanley reported that the "fair value" of the "U.S. Treasury and agency securities" held by it and its subsidiaries (including MS&Co.) was $22 billion.

94.      MS&Co. is a Delaware corporation with its principal place of business in New York, New York.  MS&Co. is registered with the SEC as a broker-dealer.  Between 2009 and 2016, MS&Co. dealt GSE Bonds to investors, including Plaintiffs, from offices located in this District. MS&Co. was an approved dealer for Fannie Mae, Freddie Mac, FHLB, and FFCB throughout the time period between 2009 and 2016.

95.      Morgan Stanley manages internal controls, oversight, and compliance for MS&Co. In this capacity, it is responsible for monitoring MS&Co.'s activities and detecting violations of law, including MS&Co.'s GSE Bond-related activities.

96.      As of December 31, 2017, MS&Co. reported that it had assets of approximately

$28 billion in U.S. agency securities (a category that includes GSE Bonds), and over $211 million in liabilities of the same.

97.    Between 2009 and 2016, Plaintiffs transacted in GSE Bonds directly with Defendant MS&Co.

98.    **Wells Fargo Bank, N.A.**: Defendant Wells Fargo is a national banking association organized under the laws of California with its principal place of business in California. It has a principal place of business at 464 California Street, San Francisco, CA 94104. It may be served with process through its registered agent for service of process, the Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

99.    Defendant Wells Fargo does business in the State of Louisiana where all acts complained of herein occurred.. It is a registered broker dealer with the SEC and FINRA, and is licensed to do business in all 50 states. It is also an approved dealer for Freddie Mac, FHLB and FNMA. 2009 and 2016, it made trades for billions of dollars' worth of GSE Bonds. And its employees priced, marketed, and dealt GSE Bonds to the City of Baton Rouge and CPERS.

100.    **Morgan Keegan** is a subsidiary of Raymond James. Raymond James is a registered broker dealer with the SEC and FINRA and is licensed to do business in the State of Louisiana. It is an approved dealer for Freddie Mac, FRHLB and FNMA. Between 2009 and 2016, it made trades for billions of dollars of GSE bonds and sold GSE bonds to the City of Baton Rouge, CPERS and the Police Guaranty Fund.

101.    **Capital One Bank.** Is a federally chartered national banking association. Its principal place of business in Glen Allen, Virginia. Capital One Bank is a registered broker dealer with the SEC and FINRA and is licensed to do business in the State of Louisiana. It is an approved dealer for Freddie Mac, FRHLB and FNMA. Between 2009 and 2016, it made trades for billions

of dollars of GSE bonds and sold GSE bonds to the City of Baton Rouge, CPERS and the Police Guaranty Fund.   This Defendant may be served with process through its registered agent, Corporation Service Company, 11 South 12th Street, Richmond, Virginia 23218.

102.       Defendants DBSI, Merrill Lynch, JPMS, FTN Financial, BCI, UBS Securities, Goldman Sachs, Cantor Fitzgerald, HSBC Securities, CGMI, BNP Securities, CS Securities, TD Securities, Nomura Securities, Baird, Stifel, Mizuho Securities, and MS&Co. were approved dealers for debt securities issued by Fannie Mae, Freddie Mac, FHLB, and FFCB between 2009 and 2016. SG Securities was an approved dealer for Fannie Mae, Freddie Mac, and FHLB Between 2009 and 2016. Defendants CGMI, and BNP Securities are approved dealers for debt securities issued by Fannie Mae, Freddie Mac, and FHLB. Defendant CS Securities is an approved dealer for debt securities issued by Fannie Mae and Freddie Mac.  Between 2009 and 2016, these Defendants had access to GSE Bond supply through the GSE Issuance Process described in Part V.C., below, which they used to acquire GSE Bond inventory to deal to investors.

## IV.  ADDITIONAL CO-CONSPIRATORS

1.       Various entities that are not named as Defendants have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.  There is a finite number of co-conspirators and Plaintiffs believe that their identities can be ascertained through Defendants' own records, including, but not limited to the productions made by Defendants to government regulators.

## V.  SUBSTANTIVE ALLEGATIONS
## BACKGROUND

### A.    The GSEs

2.       GSEs are privately run enterprises sponsored by the federal government and

established for a public purpose. Congress created Fannie Mae and Freddie Mac to provide liquidity, stability, and affordability in the national residential mortgage market. They provide liquidity (ready access to funds on reasonable terms) to banks and mortgage companies that make residential mortgage loans to consumers with the goal of making mortgage loans more affordable for consumers.

3.       FLHB is a system of 11 regional banks that was created to support mortgage lending and related community investment.

4.       FFCB is a part of the Farm Credit System and was created to provide American agricultural entities with dependable credit at competitive interest rates. FFCB issues bonds on behalf of four farm credit banks.

5.       GSEs finance operations by issuing GSE Bonds. GSE Bond issuances occur several times a month, typically in a predictable pattern based on a pre-determined calendar. The great majority of newly issued GSE Bonds have similar or identical characteristics as existing GSE Bonds except that they mature on a later date.

6.       Each GSE Bond issue is identified with a unique nine-digit alphanumeric code known as a Committee on Uniform Security Identification Procedures number ("CUSIP number"). The CUSIP number identifies specific provisions of each bond issue, such as issuer, coupon, issue date, maturity, and call provisions.

**B.       Characteristics of GSE Bonds**

7.       All GSE Bonds have core similarities that distinguish them as a single class of debt instruments.

8.       GSE Bonds are all issued by Fannie Mae, Freddie Mac, FHLB, or FFCB, and therefore carry substantially similar levels of credit risk. Credit risk is the risk that an entity will

default on its repayment obligations. Unlike U.S. Treasury bonds and bonds issued by certain federal agencies, GSE Bonds are not backed by the full faith and credit of the United States government, meaning they are not guaranteed by the federal government. Credit risk is generally low for GSE Bonds, however, because GSEs benefit from a perceived tie to the federal government as institutions established under federal legislation.  Debt issued by GSEs generally has high credit quality.  The senior debt of Fannie Mae and Freddie Mac is rated Aaa/AA+, while the subordinated debt of Fannie Mae and Freddie Mac is rated AA-/Aa-. The long-term debt of FHLB and FFCB is rated Aaa/AA+, while the short term debt of FHLB and FFCB is rated P-1/A-1+. In September 2008, the Federal Housing Finance Agency became the conservator of Fannie Mae and Freddie Mac, which permitted them to meet their obligations on over $1 trillion in outstanding bonds.

9.      GSE Bonds are unregulated, unregistered OTC issuances that are exempt from the registration and disclosure provisions of the federal securities laws.

10.     All Defendants operate trading desks that specialize in GSE Bond trading and sales in the United States, with the majority located in this District. Within each Defendant's sales and trading business, the same team that deals one issuers' GSE Bond to investors also deals all other issuers' GSE Bonds. Thus, the same employees within each Defendant's GSE Bond trading and sales business determine prices charged to investors in GSE Bond transactions for all types of GSE Bonds.

11.     GSE Bonds also have other common features. These include face value, maturity, and coupon payment, explained below. Collectively, these characteristics are used to determine a GSE Bond's "yield to maturity," which is the annual return that the holder of a GSE Bond earns from the instrument.

12.     The amount of money that a GSE owes to the holder of a GSE Bond upon maturity

is known as the "face value," and the length of time between when a GSE Bond is issued and when a GSE Bond matures is known as its "maturity." The most recently issued GSE Bonds are known as "on-the-run" GSE Bonds, while all other, older GSE Bonds with similar characteristics are known as "off-the-run" GSE Bonds.

13.     Most GSE Bonds pay a fixed rate of interest or fixed coupon rate semi-annually. Some GSE Bonds pay a variable or floating coupon rate that adjusts periodically based on a designated index. Fixed-rate GSE Bonds have fixed interest rates and fixed maturities. If held to maturity, they preserve their principal and offer certainty of cash flow.  Prior to maturity, however, the market value of fixed-rate GSE Bonds fluctuates with changing interest rates. In a falling-rate environment, market values will rise, creating the potential for capital gains. In a rising-rate environment, prices will fall, creating the risk of loss when securities are sold prior to maturity. Prices move in the inverse direction of yields, so that when prices fall, yields rise. Because yields fluctuate with market conditions, yield spreads, *i.e.*, a GSE Bond's yield to maturity minus a chosen benchmark bond, are a common basis of comparison between bonds.

14.     Medium-term GSE Bonds (GSE Bonds with maturities between two years and 10 years) and long-term GSE Bonds (GSE Bonds with maturities longer than 10 years) can also offer periodic interest payments known as "coupons." GSE Bond coupon payments occur semi-annually and are calculated by multiplying the interest rate specified for the GSE Bond (*e.g.*, 5%) by the GSE Bond's face value (*e.g.*, $100,000). Thus, a coupon-bearing GSE Bond with a face value of $100,000 and a 5% coupon payment would entitle the holder to two interest payments of $2,500 paid every six months, for a total of $5,000 per year, until maturity.  At maturity, the issuing GSE pays the holder the face value specified in the GSE Bond.

15.     Short-term GSE Bonds do not offer coupon payments. Instead, short-term GSE

Bonds are issued at a discount to face value. The difference between the price paid and the face value due upon maturity represents the interest that the GSE Bond purchaser earns in exchange for buying the short-term GSE Bond. For example, assume a purchaser pays $98,382.75 to purchase a short-term GSE Bond with a face value of $100,000 that matures in 120 days. When the purchaser redeems the GSE Bond at maturity, it receives the full $100,000 face value from the GSE, $1,617.25 more than what it paid to purchase that GSE Bond.  The extra $1,617.25 represents the amount of interest that the GSE paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

16.    GSE Bonds can be non-callable, or "bullet," bonds or callable GSE Bonds that can be redeemed by the issuer prior to maturity.

**C.    The GSE Bond Market**

17.    Fannie Mae, Freddie Mac, FHLB, and FFCB issue GSE Bonds through a pre-approved group of "Approved GSE Bond Dealers," including Defendants. Approved GSE Bond Dealers underwrite GSE Bonds issued by Fannie Mae, Freddie Mac, FHLB, and FFCB and profit from trading GSE Bonds with investors, such as Plaintiffs and the Class, in the secondary market.

18.    Thus, the GSE Bond market is structured as a three-tiered pyramid with GSEs at the top, Approved GSE Bond Dealers in the middle, and investors like Plaintiffs and the Class at the bottom. The black arrows represent GSE Bond supply.  First, Fannie Mae, Freddie Mac, FHLB, and FFCB issue GSE Bonds to Approved GSE Bond Dealers. Next, Approved GSE Bond Dealers trade GSE Bonds with investors like Plaintiff.

19.    GSEs select these Approved GSE Bond Dealers to underwrite new GSE Bonds in one of three ways: (1) by "mandate" in which the GSE requires a certain group of Approved GSE Bond Dealers to place a new bond; (2) by holding an "auction" where Approved GSE Bond

Dealers bid for the right to take the new bond to market; or (3) in response to a "reverse inquiry" from Approved GSE Bond Dealers with demand for a specific kind of bond.

20.     GSEs encourage Approved GSE Bond Dealers to participate in GSE Bond auctions by awarding "points" based on their level of activity. These points are reflected on a monthly "scorecard" circulated by each issuer. The more points an Approved GSE Bond Dealer accrues the more likely they are to be selected for mandates and given additional underwriting business from the GSEs.

21.     GSE Bond auctions occurred at regularly scheduled intervals (*i.e.*, weekly, biweekly, or daily) throughout the Time period between 2009 and 2016. In each auction, Approved GSE Bond Dealers (often working together in a group called a "syndicate") submit proposals reflecting their plan for underwriting and bringing a new bond to market. This proposal will include certain details, such as the size of the offering and how it will be allocated among the Approved GSE Bond Dealers should they be selected. If a joint bid is successful, each of the winning Approved GSE Bond Dealers that is part of the syndicate receives an allocation of newly issued GSE Bonds.

22.     Next, the newly issued GSE Bonds enter the "syndication" phase. In this phase, the Approved GSE Bond Dealers that won work together in the "primary market" to try and place the new GSE Bonds with a bulk buyer. These bulk buyers are typically regional banks that buy and hold GSE Bonds as an investment and do not sell them to other investors. During the syndication phase, the Approved GSE Bond Dealers are permitted to communicate with each other to effectuate the initial placement in the primary market. Exceptions are made to banks' usual policies prohibiting participation in multi-bank chat rooms to allow the traders working on a syndicate to easily communicate in real time.

23.　　Finally, the syndication phase ends when the Approved GSE Bond Dealers declare the new issuance "free-to-trade" often abbreviated as "FTT." Once this announcement occurs, secondary market trading begins, and the Approved GSE Bond Dealers that made up the syndicate are supposed to compete against one another to sell the newly issued GSE Bonds to investors. The traders who participated in the GSE Bond auctions and primary market syndication are the same ones responsible for selling those GSE Bonds to investors in the secondary market after they are marked FTT.

24.　　Approved GSE Bond Dealers profit from participating in the GSE Issuance Process by acquiring GSE Bond inventory that they then sell to investors for profit. The GSE Bond Issuance Process concentrates GSE Bond supply among Defendants as the largest Approved GSE Bond Dealers.

25.　　Investors, like Plaintiffs, do not participate directly in the GSE Issuance Process. Instead, they typically transact with Approved GSE Bond Dealers to invest in GSE Bonds in the secondary market.

26.　　When investors like Plaintiffs have an investment need, they can reach out to a dealer electronically or by phone. A dealer will send back an offering page, which will list all of its bonds available for sale with pricing in dollar amounts. If a bond and its price fit the investment need, then the investor would engage the dealer to get a formal offering. If both parties confirm the terms of the transaction, settlement will occur the following day or on the scheduled date for new bond issues. The purchase is cleared through Fedwire. The investor does not obtain physical possession of the GSE Bonds; the trade simply results in an entry on the Federal Reserve's Book Entry system.

**D.　　Defendants Controlled GSE Bond Supply**

27.      Defendants controlled the majority of GSE Bond supply because they purchased a large proportion of GSE Bonds through the GSE Issuance Process.  As explained above, Approved GSE Bond Dealers that participate in a GSE Bond underwriting syndicate secure substantial allocations of GSE Bond supply that they subsequently sell to investors. Accordingly, an Approved GSE Bond Dealer's share of GSE Bond underwriting correlates with the amount of GSE Bond inventory that the Approved GSE Bond Dealer can use to trade GSE Bonds with investors.

28.      Defendants have consistently been among the largest GSE Bond underwriters in the United States, and underwrote billions of dollars in GSE Bonds Between 2009 and 2016.  Thus, Defendants as a bloc dominated control of GSE Bond supply and were well-positioned to use that dominant position to fix the prices of GSE Bonds charged to Plaintiffs and the Class. The table and figures below demonstrate Defendants' market control:

**TABLE 1**

**Share of GSE Bond Underwriting from January 1, 2009 through January 1, 2016**

| Dealer | Aggregate Trading Volume During Time period between 2009 and 2016 ($) | Average Market Share During Time period between 2009 and 2016 |
|---|---|---|
| BCI | 723,691,830,335 | 14.07% |
| JPMS | 465,703,357,746 | 9.05% |
| UBS Securities | 426,950,488,975 | 8.30% |
| DBSI | 357,387,471,120 | 6.95% |
| CGMI | 331,368,079,245 | 6.44% |
| First Tennessee | 238,371,443,555 | 4.63% |
| Morgan Stanley | 236,676,490,414 | 4.60% |
| Merrill Lynch | 236,554,699,955 | 4.60% |
| BNP Securities | 215,385,393,302 | 4.19% |
| Goldman Sachs | 187,529,231,456 | 3.64% |
| CS Securities | 176,277,094,426 | 3.43% |
| Nomura Securities | 158,351,339,346 | 3.08% |
| HSBC Securities | 93,429,155,590 | 1.82% |
| TD Securities | 65,836,121,333 | 1.28% |
| Cantor Fitzgerald | 49,762,060,434 | 0.97% |

| SG Securities | 6,528,750,170 | 0.13% |
|---|---|---|
| **Total** | **3,969,803,007,402** | **77.16%** |

29.　　This high degree of concentration in the GSE Issuance Process gave Defendants substantial control over the GSE Bond supply available to investors in the secondary market. It also gave Defendants the ability to fix the prices that investors paid for GSE Bonds, and the motive and opportunity to fix GSE Bond prices to generate enormous GSE Bond trading profits.

**E.　　GSE Bond Pricing**

30.　　The market price of a GSE Bond at any given time is calculated by comparing the yield to maturity offered by the GSE Bond with the yield offered by other similar debt instruments. Investors and dealers in the GSE Bond market often use U.S. Treasury securities as a comparison to determine GSE Bond prices because U.S. Treasury securities are widely viewed as the lowest risk, most actively traded debt securities available to investors.

31.　　Interest rates and bond prices have an inverse relationship. As interest rates increase, the prices of GSE Bonds decrease to reflect the fact that an investor can earn a greater amount of interest by purchasing a new debt instrument at the higher prevailing interest rate. Conversely, as interest rates decrease, the prices of existing GSE Bonds increase to reflect the fact that the amount of interest offered by the existing GSE Bond is greater than the amount of interest an investor could earn by purchasing a new debt instrument at the prevailing interest rate.

32.　　GSE Bonds are OTC debt. Generally, employees at a trading desk within the Approved GSE Bond Dealer's GSE Bond business are responsible for determining GSE Bond price quotes offered to investors. The Approved GSE Bond Dealer sends the price quote to the investor without disseminating the price quote to the investing public. Despite the vast size of the market, trades are typically conducted over the phone or by message, person to person.

33.　　Defendants profit by selling GSE Bond inventory to customers at higher prices than

they paid in either the primary or secondary markets. Approved GSE Bond Dealers profit from trading GSE Bonds with investors by keeping the difference between the price that the Approved GSE Bond Dealer pays to purchase a GSE Bond and the price at which the Approved GSE Bond Dealer sells a GSE Bond to a customer. This difference is called the "bid-ask spread."

34.    The bid price indicates the price at which the dealer is willing to buy a given GSE Bond from a customer, and the ask price represents the price at which a dealer is willing to sell the same GSE Bond to that customer. By buying at a lower price and selling at a higher price, Defendants profit off of the difference. The wider the bid-ask spread, the greater the profit for the Defendant in a GSE Bond transaction and the higher the cost for the customer.

35.    For example, a Defendant might quote a bid-ask spread of $99.90/$100.10 for a given GSE Bond.  $99.90 is the bid price, or the price at which the Defendant is willing to purchase the GSE Bond from the customer, and $100.10 is the ask price, or the price that the Defendant is willing to accept for selling the GSE Bond. The bid-ask spread in this example is $.20.

36.    One factor that determines bid-ask spreads is transaction volume, also known as "liquidity." Bid-ask spreads have an inverse relationship to liquidity in the market. As liquidity increases, bid-ask spreads become narrower to reflect the lower risk that the dealer will be forced to carry the GSE Bond while searching for a buyer, exposing the dealer to losses arising from changing financial conditions such as a credit downgrade to a GSE or a change in prevailing interest rates.  In competitive OTC bond markets, liquidity is such a strong determinant of the bid-ask spread that it is often used as a "proxy" used to measure bond market liquidity.

37.    In competitive OTC bond markets, dealers compete against each other by offering superior prices to customers in order to secure business.  Competition keeps bid-ask spreads within a relatively narrow range, since any dealer that unilaterally quotes inferior prices to customers will

lose business to competitors.

## VI.    DEFENDANTS CONSPIRED TO FIX GSE BOND PRICES CHARGED TO INVESTORS

### A.    Direct Evidence Shows that Defendants Agreed to Fix Prices for Newly Issued GSE Bonds After Auctions

38.     As explained in Part V., above, Approved GSE Bond Dealers that acquire GSE Bonds from auctions are supposed to compete to sell the newly issued GSE Bonds to investors in the secondary market after the close of the syndication phase.

39.     Direct evidence provided by the cooperating co-conspirator shows that this is not what occurred Between 2009 and 2016. Rather, Defendants conspired to fix the price at which GSE Bonds were FTT in the secondary market at supra-competitive levels. The economic evidence of collusion described below is consistent with this evidence.

40.     This misconduct occurred regularly from at least as early as August 2009 through at least January 2016. The cooperating co-conspirator directly implicated numerous Approved GSE Bond Dealers in this misconduct, including Defendants DBSI, Merrill Lynch, BNP Securities, JPM Securities, Morgan Stanley, Goldman Sachs, Nomura, HSBC, Cantor Fitzgerald, SG Securities, TD Securities, FTN Financial, CS Securities, UBS Securities, BCI, and CGMI.

41.     For example, on February 13, 2012, MS&Co., DBSI, and BNP Securities submitted a winning joint bid in a GSE Bond auction conducted by FHLB. BNP Securities and DBSI received allocations of $167 million each,9 while Morgan Stanley received $166 million. By February 17, 2012, MS&Co., DBSI, and BNP Securities had placed approximately $67 million, $17 million, and $26 million respectively during the syndication process, leaving these dealers with approximately $390 million of newly issued GSE Bonds to sell to investors in the secondary

---

9 Bond amounts are listed in terms of "par" value in this section.

market.

42.     Prior to selling those bonds in the secondary market, on February 17, 2012, MS&Co., DBSI, and BNP Securities expressly agreed in an online multi-bank chat room to declare these bonds FTT at a supra-competitive fixed price of $99.985:

**February 17, 2012**

DBSI Trader 1:10how are you guys doing? we have 100mm left Morgan Stanley Trader 1:

150mm left

BNP Securities Trader 1:11 I'd say free it up given the cheapening trend of FHLB BNP Securities Trader 1: $140mm left

Morgan Stanley Trader 1: i just **don't want to create a race to the bottom** between the 3 of us,

doesnt help anyone.

DBSI Trader 1: ugh this thing is a pig DBSI

Trader 1: ok im fine ftt

BNP Securities Trader 1: I agree, but also don't want to see spreads gap out, FHLB widen, and see a .50 in 2y space

DBSI Trader 1: go out ftt 99.985? BNP

Securities Trader 1:

Good by me.

Morgan Stanley Trader 1: sure ftt at 99.985

---

10 Prior to joining Deutsche Bank, DBSI Trader 1 was a GSE Bond trader at Merrill Lynch from approximately July 2005 through June 2010 and HSBC Securities from approximately June 2010 through June 2011. DBSI Trader 1 left Deutsche Bank in approximately June 2013 for Goldman Sachs. DBSI Trader 1 is identified in Paragraphs 151, 165, below, as Goldman Sachs Trader 1
11 BNP Securities Trader 1 was employed by BNP Securities as a GSE Bond trader Between 2009 and 2016 from approximately September 2010 through September 2012, at which point he left for Nomura Securities. BNP Securities Trader 1 is identified in Paragraphs 174, 178, below, as Nomura Securities Trader 1

43.     In another example from September 18, 2013, Goldman Sachs and DBSI submitted a winning joint bid in an auction held by FHLB. Each received allocations of $12.5 million. Goldman Sachs and DBSI placed approximately $150,000 of these GSE Bonds during syndication, leaving approximately $24.85 million left for these dealers to sell in the secondary market. Goldman Sachs and DBSI agreed, prior to selling GSE Bonds newly issued by FHLB in the secondary market, to fix the FTT price for those bonds at $99.925:

> **September 18, 2013**
>
> Goldman Sachs Trader 1: winner
>
> Goldman Sachs Trader 1: im calling for cover
>
> DBSI Trader 2:12 ill asnd
>
> DBSI Trader 2:  1.05 with .80
>
> Goldman Sachs Trader 1: topeka.
>
> Goldman Sachs Trader 1: i got asnd queued up
>
> Goldman Sachs Trader 1: i just need CUSIP.
>
> DBSI Trader 2: ok cool
>
> DBSI Trader 2: **FTT 99.90?**
>
> Goldman Sachs Trader 1: on nim2
>
> Goldman Sachs Trader 1: **lets just go 99.925.**

44.     The direct evidence provided by the cooperating co-conspirator also shows that Defendants continued to communicate in real-time using multi-bank chat rooms after agreeing to fix the FTT price to ensure GSE Bond prices remained artificially high. In the example below, BNP Securities, DBSI, Goldman Sachs, and Merrill Lynch submitted a winning joint bid in a GSE

---

12 Prior to joining Deutsche Bank, DBSI Trader 2 worked for JPMS as a GSE Bond trader from approximately September 2001 through August 2013. DBSI Trader 2 is identified as JPMS Trader 2 in Paragraph 176, below

Bond auction conducted by FFCB. BNP Securities, DBSI, and Goldman Sachs received allocations of $69 million each, while Merrill Lynch received $68 million. By July 16, 2012, these Defendants had placed approximately $87.25 million during the syndication process, leaving $187.75 million of newly issued GSE Bonds to sell to investors in the secondary market. In the chat below, a trader from Merrill Lynch references these Defendants' agreement from July 16, 2012 to fix the FTT price at $99.875. The following day, traders from DBSI, Merrill Lynch, Goldman Sachs, and BNP Securities continued to communicate to maintain artificially inflated prices:

> **July 17, 2012**
>
> DBSI Trader 4: 99.985 on the FFCB's?
>
> BNP Securities Trader 1: Sounds good here.
>
> DBSI Trader 4: we have FHLB 0.72's (4nc3m, Amer), slightly longer settle, that we're showing at 99.85.
>
> Merrill Lynch Trader 1: [O]K
>
> Merrill Lynch Trader 1: i might be a touch higher than u guys but def[initely] not going lower.
>
> Merrill Lynch Trader 1: **we were 99.875 yesterday right**?
>
> DBSI Trader 4: correct.
>
> Merrill Lynch Trader 1: cool.
>
> DBSI Trader 4: you guys all cool w/ that?
>
> BNP Securities Trader 1: We made a client sale on the 2.25s this a.m. at 99.75 with 10s at 10.
>
> Merrill Lynch Trader 1: yes sir.
>
> BNP Securities Trader 1: our live mark right now is 99.66.
>
> DBSI Trader 4: I know we're FTT, and anyone can hit any bid, **but given that it's day #2 w/ these bonds, figure maybe we at least try and stay on the same page** (especially the 3yr). . .less volatile.
>
> BNP Securities Trader

1: too cheap? DBSI

Trader 4: i buy them

Goldman Sachs Trader 2: if we are free to trade, we cannot talk about prices

DBSI Trader 4: ok. fair enough.  just don't want anyone getting
annoyed if someone hits a bi[d].

45.    These examples of chats show that Defendants were motivated to agree on a fixed price for newly issued GSE Bonds so that they could secure higher profits, represented by the difference between the prices that Defendants paid for GSE Bonds in auctions and the prices at which Defendants sold GSE Bonds to investors. Agreeing to inflate prices for these GSE Bonds allowed Defendants to both lock in low-risk profits by reselling newly issued GSE Bonds for a quick profit and to protect GSE Bonds that they held in inventory from declining in value.

46.    Likewise, in an example from August 31, 2011, BNP Securities, Cantor Fitzgerald, and DBSI submitted a winning joint bid in a GSE Bond auction conducted by FFCB. BNP Securities and DBSI received allocations of $165 million each, while Cantor Fitzgerald received an allocation of $50 million. By September 1, 2011, these Defendants had placed  approximately $200.2 million during the syndication process, leaving these dealers with approximately $179.8 million of newly issued GSE Bonds to sell to investors in the secondary market. Recognizing that the value of their inventory was declining, traders from DBSI, BNP Securities, and Cantor Fitzgerald agree in the chat below to fix the FTT price artificially higher at $99.925, above where they could sell the bonds during syndication:

**September 1, 2011**

DBSI Trader 1: are we still in synd[ication] on the stepper [*i.e.*
a type of bond]? BNP Securities Trader 1: I'd say so.

BNP Securities Trader 1: and the .47s.

BNP Securities Trader 1: CF [Cantor
Fitzgerald] is out of those. DBSI Trader 4: want

to go FTT on the 0.47's?

DBSI Trader 1: ok so stay in synd[ication] less .25 on the 3yr step

[a type of bond]. BNP Securities Trader 1: I was thinking give it a

couple hours this morning.

BNP Securities Trader 1: You know I make par sales all day.

DBSI Trader 4: you really think you're going to make some par sales?

BNP Securities 1: Prob right.... 99.925?

DBSI Trader 4: Given our phenomenal distribution to end
acc[oun]ts w/ $1.25 in a 2yr bond... we have 2 options: 1) Sell
bonds to regionals at 99.90 (less 1.00) OR
2) Sell bonds to regionals at 99.925 FTT.

DBSI Trader 4: this way we make .50

instead of .25 :) BNP Securities

Trader 1: Well argued

BNP Securities

Trader 1: I go #2

BNP Securities

Trader 1: FTT.

47.    Defendants' anticompetitive practice of agreeing to fix the FTT price for newly

issued GSE Bonds was pervasive and affected the prices of GSE Bonds throughout the Time period

between 2009 and 2016. This includes GSE Bonds that Plaintiffs transacted directly with

Defendants Between 2009 and 2016. *See* Part VII., below.

48.    In the absence of a conspiracy, no single dealer would be able to unilaterally

maintain prices for GSE Bonds above a competitive level for a significant period of time without

losing business to its competitors.

### 1. Direct Evidence Provided by the Cooperating Co-Conspirator Implicates Each of the Defendants

49.    In regard to the remaining Defendants, the Plaintiffs would aver that each have

committed acts which implicate them in the scheme to prevent competition in the FFB market. These acts are confirmed by transcripts of chat room conversations which read as follows:

**UBS**

50.      On July 1, 2010, UBS and DBSI submitted a winning joint bid in an auction for $100 million Freddie Mac GSE Bonds.  After placing approximately $9 million of these GSE Bonds during syndication, UBS and DBSI had approximately $91 million left to sell in the secondary market. UBS and DBSI impermissibly agreed to fix the FTT price of these bonds at $99.70:

> **July 2, 2010**
>
> UBS Trader 2: less 3.5? or ftt?
>
> DBSI Trader 3:13 YOUR CALL FTT MIGHT BE AN EASIER SALE
>
> UBS Trader 2: i got bberg. thx for joining.
>
> DBSI Trader 3: WHICH FTT -3.5?
>
> UBS Trader 2: ftt – 99.70
>
> DBSI Trader 3: GOT IT TKS

51.      UBS also impermissibly agreed with CS Securities, MS&Co. and DBSI to fix the price of GSE Bonds as shown in Paragraph 161, below.

**Cantor Fitzgerald**

52.      On January 18, 2012, DBSI, BNP Securities, Cantor Fitzgerald, and HSBC submitted winning joint bids in FFCB auctions for two GSE Bonds with CUSIP number 313EAAQ1 and 313EAAN8. DBSI, BNP Securities, Cantor Fitzgerald, and HSBC agreed to fix

---

13 DBSI Trader 3 was previously employed by UBS Securities from approximately July 1998 through April 2009, when he left to join Deutsche Bank. DBSI Trader 3 subsequently left DBSI in approximately May 2011 to join TD Securities. DBSI Trader 3 is identified as TD Securities Trader 2 in Paragraphs 171, 174, below.

the FTT price of both GSE Bonds at the supra-competitive level of $99.90:

**January 18, 2012**

<u>Cantor Fitzgerald Trader 1</u>: FTT at 99.90?

<u>BNP Securities Trader 1</u>: [Cantor Fitzgerald Trader 1], how about $35mm of the 2.25 and $50mm of the 2.75?

<u>BNP Securities Trader 1</u>: That way, we each take $50mm 2.25y and $143mm 2.75y?

<u>Cantor Fitzgerald Trader 1</u>: ok

<u>DBSI Trader 1</u>: [BNP Securities Trader 1] – bnp and db taking 144mm of the 2.75
. . .hsbc 143mm and cf 50mm

<u>DBSI Trader 4</u>:14 where are we going out on these bonds?
99.90? just want to make sure everyone's cool w/ that…

<u>DBSI Trader 4</u>: thx.

<u>Cantor Fitzgerald Trader 1</u>: Yes, 99.90

<u>BNP Securities Trader 1</u>:

99.90 on everything <u>DBSI</u>

<u>Trader 4</u>: Thx.,…

53.    As discussed in Paragraph 153 above, Cantor Fitzgerald was also a co-underwriter

of a GSE Bond whose secondary market price was impermissibly fixed.

   **Credit Suisse**

54.    In July 2012, MS&Co., DBSI, CS Securities, and UBS submitted a winning joint

bid in an auction for GSE Bonds. Each Defendant then agreed in a group chat to declare these

bonds FTT at a supra-competitive, fixed price of $100.02:

**July 12, 2012**

<u>DBSI Trader 1</u>:

---

14      Prior to joining Deutsche Bank, DBSI Trader 4 was employed as a GSE Bond trader at CGMI from approximately 2001 through 2009.

shall we go FTT?

CS Securities

Trader 1: hi

Morgan Stanley Trader 1: i vote yes

DBSI Trader 1:  morning

CS Securities Trader 1: at -13 I see these 100.018, does that look right?

Morgan Stanley Trader 1: **i see an upsize px at -13 of 100.02**

Morgan Stanley Trader 1: so i agree

DBSI Trader 1: we have 100.01 so agree

Morgan Stanley Trader 1: **i dont want to sell any below there to be honest**

UBS Trader 1:15 **FTT we are following**

CS Securities Trader 1: ok, so ftt then. thanks

Morgan Stanley Trader 1: ftt agreed

DBSI Trader 1:  agreed.

55.    Similarly, on January 20, 2011, CS Securities, DBSI, and BNP Securities agreed

to fix the FTT price of a GSE Bond at a supra-competitive level of $99.90:

**January 20, 2011**

BNP Securities Trader 1: FTT?

Credit Suisse Trader 1: sure. Ftt 8 aoas16

---

15 UBS Trader 1 previously worked for BNP Paribas as a GSE Bond
trader from approximately November 2010 through July 2013.

16 The agency option adjusted spread ("AOAS"), is an alternative way of communicating the price of a GSE Bond

> BNP Securities Trader 1: 8 AOAS seems a bit cheap, no?: 99.82
>
> BNP Securities Trader 1: I was thinking 99.90
>
> DBSI Trader 3: fft, good luck on these

### Citi and First Tennessee

56.     On August 17, 2012, First Tennessee, BNP Securities, DBSI, and CGMI. submitted the winning joint bid in a GSE Bond auction held by FFCB for $190 million in GSE Bonds. Each Defendant received an allocation of $47.5 million GSE Bonds. On August 22, 2012, First Tennessee, BNP Securities, DBSI, and CGMI agreed in a group chat to declare those bonds FTT at the supra-competitive, fixed price of $99.95:

> **August 22, 2012**
>
> First Tennessee
> Trader 1: FTT 99.95?
> BNP Securities
> Trader 2: I think ftt
> DBSI Trader 1:
> sounds good
> DBSI Trader 1: [CGMI Trader 1] – you ok?
> CGMI Trader 1: FTT is good. It has been a while
> since issuance date. DBSI Trader 1: cool. ftt

### Société Générale

57.     On October 19, 2011, SG Securities and DBSI submitted the winning joint bid in an auction for $50 million Fannie Mae GSE Bonds. Each received an allocation of $25 million GSE Bonds, and placed approximately $5 million each during the syndication phase. Two days later – with approximately $20 million each left to sell – SG Securities and DBSI agreed to declare

these GSE Bonds FTT at the supra-competitive, fixed price of $99.80:

> **October 21, 2011**
>
> SG Securities Trader 1: Hey [DBSI Trader 4] – I did a small
> stepper deal with [DBSI Trader 1] the other day:
>
> SG Securities Trader 1: We have them at 100-1.75 I have 20 odd left
>
> SG Securities Trader 1: I think we get a bit more traction if
> we free them . . . wanna free to 99.80?
>
> DBSI Trader 4: What's up [SG Securities Trader 1]? Yeah …sounds good to me.
> 99.80 ftt works… Thanks. We have 20.7mm left, so same boat…

58.    As another example, on April 29, 2012, DBSI, SG Securities, and Goldman Sachs,

agreed to declare a GSE Bond issued by Fannie Mae FTT at a supra-competitive, fixed price of

$99.95.

> **April 19, 2012**
>
> SG Securities Trader 1: mind if we just free them to 99.925 and
> wake some people up
>
> DBSI Trader 1: SURE
>
> Goldman Sachs Trader 2: I'm ok with that

59.    Similarly, on September 23, 2011, DBSI, SG Securities, and Merrill Lynch agreed

to declare another GSE Bond FTT at a supra-competitive, fixed price of $99.875.

> **September 23, 2011**
>
> DBSI Trader 1: talked to [SG Securities Trader 1], lets FTT on 7y
> stepper 99.875? u cool?
>
> Merrill Lynch Trader 1: k

## HSBC Securities

60.    On February 1, 2012, BNP Securities, DBSI, and HSBC Securities submitted a joint

winning bid for $165 million in GSE Bonds in an FFCB auction. Each Defendant received an

allocation of $55 million GSE Bonds. By February 3, 2012, these Defendants had placed $92 million of these bonds via syndication, leaving $73 million left to sell to investors in the secondary market. HSBC Securities, BNP Securities, and DBSI then agreed to declare the bonds FTT at a supra-competitive, fixed price of $99.85.

> **February 3, 2012**
>
> HSBC Securities Trader 2: How much size do u guys have left on the 0.80% HSBC Securities Trader 2: good morning
>
> BNP Securities Trader 3:17 3mm
>
> HSBC Securities Trader 2: still have 30mm left
>
> HSBC Securities Trader 2: can we do ftt? what level do we want to show out? BNP Securities Trader 3: i have 3m, what ever you want to go
>
> DBSI Trader 1: we have 40mm left
>
> DBSI Trader 1: lets ftt @ 99.85
>
> HSBC Securities Trader 2: sounds good

61.    As another example, on August 6, 2009, DBSI and HSBC agreed to declare a GSE Bond FTT at the supra-competitive, fixed price of $99.95:

> **August 6, 2009**
>
> HSBC Trader 4:18 ok will go with 99.95
>
> DBSI Trader 3: Free to trade @ 99.95?
>
> HSBC Trader 4: yup. sound ok?
>
> DBSI Trader 3: where did we buy it?
>
> HSBC Tracer 4: i bot it 99.93

---

17 Prior to joining BNP Securities in July 2010, BNP Securities Trader 3 was employed by JPMS as a GSE Bond trader from approximately May 2008 through June 2010. BNP Securities Trader 3 is referred to as JPMS Trader 3 in Paragraph 177, below

18 Prior to joining HSB Securities, HSBC Trader 4 worked at UBS from approximately August 1993 to April 2009

> DBSI Trader 3: Ok – DO you want to try 99.96??
>
> HSBC Trader 4: I think getting out scratch on this trade would be great. I'm afraid of payrolls tomorrow. 99.95 would be my preference.

62.     As discussed above in Paragraph 159, HSBC also agreed with DBSI, BNP Securities, and Cantor Fitzgerald to fix the FTT price of two GSE Bonds at a supra-competitive level.

### TD Securities

63.     On April 23, 2012, DBSI and TD Securities submitted the winning joint bid in a GSE Bond auction. DBSI Trader 1 separately contacted First Tennessee Trader 2 and TD Securities Trader 1 to coordinate pricing for this new GSE Bond. After confirming that DBSI and TD Securities had both "marked" the bond, *i.e.*, valued it on their books, at $99.975, DBSI. First Tennessee, and TD Securities agreed to declare these bonds FTT at a supra-competitive, fixed price of $99.98:

> **April 23, 2012**
>
> DBSI Trader 1: [First Tennessee Trader 2] has 5mm left . . . where do you have em marked? Since we've barely sold any it may be tough to sell em at a higher px than our dealer re? would 99.975 work?
>
> TD Securities Trader 1: I have them marked there, had them hedged vs 3 yrs…
>
> DBSI Trader 1: ugh. ok. well im fine do either. i think 99.975 would make more sense especially considering we haven't gotten any sales off to regionals at that price but im good to do whatever
>
> TD Securities Trader 1:
>
> how about 99.98?. DBSI
>
> Trader 1: that work. ftt at
>
> 99.98

64.     Likewise, on October 24, 2013, TD Securities, DBSI, and BNP Securities agreed to fix the FTT price of a GSE Bond at $99.975:

**October 24, 2013**

BNP Securities Trader 2: Ok so what do we want to do here . . . ?

TD Securities Trader 2: tell nina that usually 5bps or more is nim2 – able

TD Securities Trader 2: 11/7th and 6 bps

TD Securities Trader 2: and FTT at 99.975

DBSI Trader 2: fine here

BNP Securities Trader 2: ok

65.     As discussed below at Paragraph 174, TD Securities also agreed with BCI, DBSI, and Nomura Securities to impermissibly set the FTT price for a new GSE Bond on August 14, 2013.

**Barclays**

66.     On July 11, 2011, BCI, DBSI, and BNP Securities submitted the winning bid in an FHLB auction for $500 million of GSE Bonds. DBSI and BNP Securities each received an allocation of $167 million, while BCI received $166 million. BCI, DBSI, and BNP Securities agreed to declare those GSE bonds FTT at the supra-competitive, fixed price of $99.99:

**July 12, 2011**

BCI Trader 1: [BNP Securities Trader 1] you guys are close to out right? BNP Securities Trader 1: Yes, $56mm

DBSI Trader 4: I still have most of mine . . . how you doing [BCI Trader 1] BCI Trader 1: yep still long

BCI Trader 1: 150

DBSI Trader 4: Yean, I have 148mm. . .

*    *    *

DBSI Trader 4: Want to FTT? Again, I'm find with whatever. . . .

DBSI Trader 4: Usually don't like to FTT right away, but mkts are volatile, etc. . .

BCI Trader 1: lets go -.01 for now

and match them BCI Trader 1:

circle back up in a few?

DBSI Trader 4: sounds good here . . .

BCI Trader 1: cool

DBSI Trader 1: less .01 it is . . .

BNP Securities Trader 1: **We can't increase fees, so FTT OK?**

DBSI Trader 4: **that's fine . . .**

DBSI Trader 4: **99.99**

67.    As a further example, on August 14, 2013, BCI, TD Securities, DBSI, and Nomura

Securities agreed on the FTT price for a new GSE Bond:

**August 14, 2013**

BCI Trader 1: FTT it at 99.975?

TD Securities Trader 2: yes

TD Securities Trader 2: or par with

25c doesn't matter DBSI Trader #: L-

5 equiv I see 99.94 for 9/6

Nomura Securities Trader 1: I'm fine 9/6 . . . I see equiv at 99.95

BCI Trader 1: I got him to move more on the 8/26th I can try my

best on the 9/6th BCI Trader 1: i'm fine at 99.95

BCI Trader 1: I think we can at least get that

**JPMorgan Securities**

68.     On September 28, 2010 DBSI and JPMS submitted the winning bid in an auction

for $50 million of Fannie Mae GSE Bonds. The next day, on September 29, 2010, DBSI and JPMS

"upsize" their position, purchasing an additional $50 million in GSE Bonds from Fannie Mae at a

price of $99.85.  Immediately after securing these additional GSE Bonds, DBSI and JPMS agree to

declare them FTT at the supra-competitive, fixed price of $99.90:

> **September 29, 2010**
>
> DBSI Trader 3: want to upsize for 25mm or something? DBSI Trader 3: just to
>
> get it back on tape?
>
> JPMS Trader 1: what's the price?
>
> DBSI Trader 3: waiting on FNMA to send it to me JPMS Trader 1: are you
>
> looking at anything else? DBSI Trader 3: 99.86
>
> JPMS Trader 1: i am ok to upsize
>
> *        *        * DBSI Trader 3: hey
>
> DBSI Trader 3: 50mm done at 99.85 DBSI Trader 3: cool?
>
> DBSI Trader 3: free at 99.90 DBSI Trader 3: cool?
>
> JPMS Trader 1: ok

69.     In another example, on July 22, 2011, JPMS, DBSI, and BNP Securities agreed to

fix the FTT price of a GSE Bond at par:

> **July 22, 2011**
>
> DBSI Trader 4: cool . . .
>
> JPMS Trader 2: let's free this step
>
> BNP Securities Trader 1: Woah, someone catch a Friday afternoon bid?
>
> BNP Securities Trader 1: Or just don't want to sell them discounted any more?
>
> JPMS Trader 2: i wish

> JPMS Trader 2: yea
>
> BNP Securities Trader 1: Fine by me
>
> BNP Securities Trader 1: FTT . . . par on my screen now
>
> JPMS Trader 2:  same
>
> JPMS Trader 2: 99.99999999999999999999

70.    On August 11, 2009, JPMS Trader 3 messaged DBSI Trader 3 to propose declaring a GSE Bond FTT at the supra-competitive, fixed price of $99.70:

> **August 11, 2009**
>
> JPMS Trader 3: let's go 99.70 ftt?

### Nomura Securities

71.    On February 18, 2014, Nomura Securities, Goldman Sachs, and DBSI submitted a winning joint bid in an auction for $25 million of GSE Bonds issued by FHLB. When FHLB reopened the issuance on the same day, Goldman Sachs received a total allocation of $24.5 million, DBSI received $25 million, and Nomura Securities received $25.5 million. DBSI, Nomura, and Goldman Sachs subsequently agreed to "go out with" these GSE Bonds in the secondary market at the supra-competitive, fixed FTT price of $99.95:

> **February 18, 2014**
>
> Nomura Securities Trader 1:
>
> .35% w/50c ish? DBSI
>
> Trader 2: .35 w/ .40
>
> DBSI Trader 2: .49
>
> Nomura Securities Trader 1: fine there
>
> Nomura Securities Trader 1: I would want to go out with

these 99.95 (or -50c) if we win . . . just my opinion given the

horrendous cpn <u>DBSI Trader 2</u>: sure

<u>Nomura Securities Trader 1</u>: winner, my opinion FTT. I have ASND.

\*        \*        \*

<u>Nomura Securities Trader 1</u>: so

syndicate or FTT? <u>Nomura</u>

<u>Securities Trader 1</u>:  Let's just

FTT <u>DBSI Trader 2</u>: ftt

<u>Nomura Securities Trader 1</u>: cool

<u>DBSI Trader 2</u>: 99.85

bid on your piece

<u>Nomura Securities</u>

<u>Trader 1</u>: ha ha ha

72.    As discussed above at Paragraph 174, Nomura Securities also agreed, on August

14, 2013, with BCI, TD Securities, and DBSI to impermissibly set the price for a new GSE Bond.

**B.    The DOJ Is Conducting a Criminal Price-Fixing Investigation
into the GSE Bond Market**

73.    On June 1, 2018, *Bloomberg* reported that four confidential sources revealed that

the DOJ is conducting a criminal investigation into collusion among dealers to fix prices for bonds

issued by Fannie Mae and Freddie Mac.

74.    These confidential sources revealed that the investigation concerns the prices that

dealers in the market for Fannie Mae and Freddie Mac bonds charged to investors, such as

Plaintiffs and the Class. Specifically, the investigation focuses on illegal activities of bank traders

suspected of coordinating in the secondary market to benefit the institutions they work for.

75.    Though the *Bloomberg* report only revealed the existence of a DOJ investigation

as to two GSEs – Fannie Mae and Freddie Mac – direct evidence provided by the cooperating co-

conspirator described herein, as well as recent public filings, show that the investigation goes beyond that. For example, BNP Paribas disclosed in its annual financial report filed on March 5, 2019, that it was being investigated by "US regulatory and law enforcement authorities" for its conduct in the market for "US Agency bonds," which is synonymous with GSE Bonds – in addition to U.S. Treasury securities.

**C.    Features of the GSE Bond Market Fostered Collusion Among Defendants**

76.    In addition to the above-cited direct evidence of conspiracy, circumstantial evidence, sometimes referred to as "plus factors," further support an inference of collusion.

### 1.    The GSE Issuance Process Put Horizontal Competitors Together in Private Chats

77.    The very nature of how GSE Bonds come to be sold in the secondary market facilitated Defendants' anticompetitive scheme.

78.    As explained above, GSEs can award Approved GSE Bond Dealers the right to underwrite and syndicate GSE Bonds through an auction process that allows for groups of Approved GSE Bond Dealers to submit joint bids. After the auction is held, the winning group of Approved GSE Bond Dealers are permitted to communicate with each other about GSE Bonds to facilitate their placement in the primary market. However, this communication among members of the syndicate is supposed to end once the GSE Bonds are designated FTT in the secondary market.

79.    Defendants did not have systems and controls in place to prevent communication among syndicate members after secondary market trading began Between 2009 and 2016 (or to prevent communications during the syndication phase about prices that would be maintained once secondary market trading began). In fact, Defendants' business practices facilitated such continued communication by placing the same traders involved in the GSE Issuance Process in charge of

trading GSE Bonds in the secondary market after they were FTT.

80.    In particular, because Defendants could communicate freely with one another during the underwriting and syndication of GSE Bonds, they were able to use those lines of communication to enter into illegal agreements about pricing once the bonds were FTT in the secondary market.  Instead of letting the competitive forces of the market dictate the pricing of the GSE Bonds, Defendants agreed not to compete so as to prevent a "race to the bottom."

81.    Defendants also used their electronic group chat rooms, namely, a program called Instant Bloomberg, to maintain their collusive price-fixing scheme and coordinate in real time to share proprietary customer information and align their pricing throughout the life of a GSE Bond.

82.    In the secondary market, customers typically contact only a limited number of dealers before transacting. Furthermore, the time required to navigate the OTC process provides dealers with the opportunity to communicate and collude with one another before an order is executed.

83.    These secret communications enabled Defendants to communicate continuously and to inform each other of inventories, positions, customers, and pricing.  By sharing information regarding customer strategies and positions, Defendants necessarily gave themselves an informational advantage to the detriment of investors. It is well recognized in the financial literature that the improper sharing of information among dealers regarding customer inventories, trading positions, and strategies causes customers to receive worse terms of trade.

### 2.    The Revolving Door and Social Nature of the Market

84.    The GSE Bond traders and sales personnel at Defendants' respective offices had well-established relationships, sometimes dating back to prior overlapping employment. They worked together regularly, over an extended period of time, as a small group of traders and

salespeople operating in the same markets. Defendants' GSE Bond traders and sales personnel were well-acquainted with each other and had pre-existing relationships based on time spent working together within one of the Defendant's GSE Bond business.

85.     Between 2009 and 2016, employees on GSE Bond desks moved fluidly among positions at the various banks. The revolving doors fostered relationships with the traders among the horizontal competitors that facilitated familiarity which allowed them to discuss and agree upon pricing in the secondary market and trust that all the parties would go along with the agreement.

86.     These traders also routinely gathered for social and industry events at which they were able to freely discuss sensitive market information and the coordinate trading activities.

87.     For example, GSE Bond traders regularly met and socialized at an event organized by an executive of FFCB called "Tips for Parkinson's." At this annual event, the GSE traders served as bartenders competing against each other for tips.

88.     Participants in the GSE Bond market also attended and socialized at the Government Investment Officers Association conferences in Las Vegas, Nevada.

89.     Inter-dealer brokers would regularly take GSE Bond traders from different banks for dinners, sporting events, and other group engagements where they could have communicated about pricing, agreements, and trading activities.

### 3.     The GSEs and Market Conditions Fostered Such Behavior

90.     The GSEs monitored Defendants' performance in the secondary market and awarded underwriting privileges based in part on success in the secondary market.  This connection between the underwriting process and the secondary market gave Defendants a motive to conspire to raise and fix prices in the secondary market.

91.     GSE Bonds grew in popularity following the financial crisis in the United States. This was largely due to the pressure from investors to invest in "safe" instruments and to reduce risk following losses in 2008 and 2009.  For instance, a growing number of U.S. investors (pension funds, insurance companies, etc.) turned to GSE Bonds to meet safety requirements in bylaws or investment guidelines following the collapse. At the same time, GSE Bond dealers were under enormous pressure to generate profit while the federal government mandated that GSEs reduce the debt on their books after the 2008 financial crisis. The reduction in issuances meant less profit opportunity for the dealer banks, giving them further incentive to collude to reduce competition in the already shrinking market.

92.     The structure of the market is such that the awarding of underwriting services for a primary issuance (a highly lucrative position) is based on volume in the secondary market. GSEs circulate monthly "scorecards." Scorecard rankings then dictate which dealers will be rewarded with "mandates" for more underwriting business, resulting in additional fees for the dealers.  In an efficiently functioning market, the desire to maintain volume in the secondary market so as to be awarded a role in the primary issuance would incentivize any single dealer to put downward pressure on prices and compete against others. By agreeing to fix secondary prices, however, Defendants ensured that they could all maintain sufficient volume of sales to be awarded roles in the primary issuance without having to undercut each other on price in the secondary market so as to maintain that volume.

93.     Further, employees on Defendants' GSE Bond desks were motivated to increase profits at all costs because their compensation was tied to profit in that they were compensated based on how much profit they attained.  Price fixing was thus a means by which the dealers sought to increase revenues and therefore their compensation.

### 4.    Concentration and High Barriers to Entry

94.    There is a high level of industry concentration in the GSE Bond market.  Defendants are a relatively small number of competitors who controlled the supply of GSE Bonds available to investors through their dominant share in the GSE Issuance Process.

95.    There are high barriers to entry into the GSE Bond market. It is expensive to become an Approved GSE Bond Dealer, and few banks can bear the costs and risks associated with carrying sufficient GSE Bond inventory to serve as a dealer in the GSE Bond market. As explained above in Part V., changes in prevailing interest rates and other factors can affect the value of GSE Bonds held in a dealer's inventory, limiting the ability of smaller players to engage in large GSE Bond trades or hold GSE Bond inventory. The Bank for International Settlements, a policy and research organization owned by 60 of the world's leading central banks, explained that barriers to entry for prospective dealers in OTC markets like the GSE Bond market include: "a sufficiently large client base to get a good view of the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets, including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities."

96.    These barriers to entry prevented non-cartel members from competing with Defendants' cartel on equal terms and luring customers by offering superior prices.

### D.    Analysis of GSE Prices and Other Economic Data Is Consistent with the Existence of Defendants' Conspiracy

97.    Upon information and belief, the Plaintiff avers that there has been an examination of GSE Bond prices Between 2009 and 2016 in numerous ways. The resulting analyses of GSE Bond prices throughout the time period between 2009 and 2016 are consistent with a price- fixing

conspiracy that successfully inflated the prices that investors paid when buying GSE Bonds and deflated the prices investors received when selling GSE Bonds throughout the time period between 2009 and 2016.

98.     Consistent with the focus of the DOJ's investigation and the information provided by the cooperating co-conspirator, now known to be Deutsche Bank, that economic analysis uncovered statistically significant (with a confidence degree of 95%)[19] anomalies in GSE Bond pricing that are inconsistent with normal, competitive market conditions. Specifically, the economic facts are consistent with the information obtained from the cooperating co-conspirator in that they show that Defendants' conspiracy to fix the prices of newly issued GSE Bonds immediately following each GSE Bond issuance resulted in artificially higher prices. Furthermore, the economic facts show that Defendants fixed the prices for on-the-run GSE Bonds artificially higher in the period leading up to a new GSE Bond issuance to support this price inflation. As further evidence of the conspiracy, the economic analyses demonstrate that the bid-ask spreads were artificially inflated throughout the Time period between 2009 and 2016 on all GSE Bond transactions with investors.

99.     For each of these analyses, the GSE Bond prices charged by Defendants were anomalous Between 2009 and 2016 as compared to the period after January 1, 2016.

### 1.    Defendants Fixed the Prices of Newly Issued GSE Bonds

100.     An examination of the prices that Defendants charged investors for newly issued GSE Bonds soon after GSE Bond issuances when Defendants had new GSE Bond inventory to sell. What is observed are anomalous pricing patterns that show inflated prices for newly issued

---

19 Statistical significance means that the results are at least 95% likely to have been caused by factors other than chance or coincidence

GSE Bonds. This caused investors like Plaintiff to overpay for GSE Bonds.

101.    The examination of data was conducted to first observe the difference between the price that Defendants paid to purchase GSE Bonds from GSEs and the price that Defendants then charged to investors for these same GSE Bonds.

102.    In a competitive market, this difference should be especially small for Defendants' sales of newly issued GSE Bonds made on the same day that GSEs issued the GSE Bonds ("offer days"). For these sales, only a short amount of time has passed (*i.e.*, less than one day) between the time when the Defendant purchased the GSE Bond from the GSEs and the time when it sells the same GSE Bond to an investor. Thus, the impact of new information, such as changes in prevailing interest rates, the GSE's creditworthiness, or liquidity, is near zero[20] Moreover, the secondary market for these on-the-run bonds is highly liquid, further implying that the price differential paid to Defendants should be quite small.

103.    Plaintiff has obtained pricing data for GSE Benchmark and Reference Notes (collectively, the "Notes"). The Notes are among the most traded GSE Bonds, accounting for over 2.5 million transactions from March 1, 2010 through December 31, 2017.[21] Defendants participated in underwriting 78.6% of these instruments from March 1, 2010 through January 1, 2016.

104.    The City of Baton Rouge and CPERS's review has observed the average difference between the price that Approved GSE Bond Dealers paid to GSEs for Notes and the price at which Approved GSE Bond Dealers sold these Notes to investors on offer days from January 1, 2016 through December 31, 2017 (*i.e.*, after the Time period between 2009 and 2016). This difference was very small after the Time period between 2009 and 2016, averaging 1.2 basis

---

20 For an explanation of how such information impacts GSE Bond pricing, *see* Part V., above.
21 Data for this analysis is first available as of March 1, 2010, when reporting to TRACE became mandatory.

points22 .

105.    Additionally, there was a review to observe the average difference between the price that Approved GSE Bond Dealers paid to GSEs for Notes and the prices at which Approved GSE Bond Dealers sold these newly issued Notes to investors on offer days before January 1, 2016 (*i.e.*, Between 2009 and 2016). This difference was 10.6 basis points.

106.    Thus, the price that Defendants charged investors for newly issued Notes on offer days were ***nine times higher*** before January 1, 2016 than after. These results are anomalous. The substantial decrease in the prices of newly issued Notes after the Time period between 2009 and 2016 would not have been observed in a competitive market.

107.    Based upon the above, the higher difference between 2009 and 2016, indicates that Defendants colluded to charge higher prices to investors for newly issued GSE Bonds Between 2009 and 2016.

108.    Plaintiffs' analysis also demonstrates that the price inflation for newly issued GSE Bonds persisted for a minimum of one week after offer days.

109.    With regard to all GSE Bonds issued after March 1, 2010, this analysis showed that each Defendant charged significantly higher prices for newly issued GSE Bonds it sold to investors Between 2009 and 2016 compared to after January 1, 2016.

110.    The data displayed in Figure 3 is not reflective of a competitive market and instead demonstrates that the prices of newly issued GSE Bonds that Defendants underwrote were artificially inflated from at least March 1, 2010 through January 1, 2016, which is represented by the red bar on the left. The blue bar shows that this increase in price was only 1.15 basis points

---

22 The term "basis point" is used to compare price and yield.  Each percentage point is divided into 100 basis points, or "bp." A basis point therefore refers to 1/100th of one percent. As an example, the difference between an interest rate yield of 6% and 6.12% is 12 bp.

from January 2, 2016 through December 31, 2017.[23]  However, the red bar shows that this increase was on average 2.58 basis points from March 1, 2010 through January 1, 2016, **_more than two times higher than the blue bar_**.

111.    In addition, an increase is observed in prices that Defendants charged for newly issued GSE Bonds relative to the yields offered by U.S. Treasury securities with comparable maturities. U.S. Treasury securities carry a similar amount of credit risk as GSE Bonds.

112.    Prices of U.S. Treasury securities are affected by the same macroeconomic factors and market conditions as GSE Bonds. For example, changes in the credit condition of the U.S. federal government and prevailing interest affect GSE Bonds and U.S. Treasury securities similarly.

113.    For each GSE Bond issuance, Plaintiffs compared the difference between the price that each Defendant charged to investors for newly issued GSE Bonds and the price that the same Approved GSE Bond Dealer charged to investors for newly issued U.S. Treasury securities of a comparable maturity. For example, Plaintiffs compared the price that Defendants charged investors for newly issued GSE Bonds with five-year maturities to the yields offered by comparable five-year U.S. Treasury Notes, and compared the prices that Defendants charged investors for newly issued GSE Bonds with 10-year maturities to the comparable newly issued 10-year U.S. Treasury Notes, etc. Plaintiffs repeated this process for GSE Bonds and U.S. Treasury securities with maturities from one year through 10 years.

114.    Plaintiffs' analysis shows that the inflated prices that Defendants charged for newly issued GSE Bonds on offer days was highly abnormal as compared to the yields offered by U.S.

---

23 The term "basis point" is used to compare price and yield.  Each percentage point is divided into 100 basis points, or "bp." A basis point therefore refers to 1/100th of one percent. As an example, the difference between an interest rate yield of 6% and 6.12% is 12 bp

Treasury securities of comparable maturities.

115.    In Figure 4, the vertical axis represents the difference between: (1) the increase in price that an Approved GSE Bond Dealer charged to investors for newly issued GSE Bonds over the price that the Approved GSE Bond Dealer paid to purchase the GSE Bonds from the issuer; and (2) the yield offered by U.S. Treasury securities with a comparable maturity. The baseline, marked "0," indicates the point where this difference is zero (*i.e.*, where the increase in price that an Approved GSE Bond Dealer charged to investors for newly issued GSE Bonds is equal to the yield offered by U.S. Treasury securities of a comparable maturity). The red bars represent this difference for Defendants, and the blue bars represent this difference for non-Defendant Approved GSE Bond Dealers. The column on the left shows the difference prior to January 1, 2016, and the column on the right shows the difference after January 1, 2016.

116.    This analysis shows that the prices that Defendants charged for newly issued GSE Bonds that they underwrote prior to January 1, 2016 were not explained by macroeconomic factors or conditions in bond markets generally.

**2.    Defendants Fixed the Prices of the Previously Issued GSE Bonds Just Before They Went "Off-the-Run" to Create an Artificial Benchmark**

117.    As explained in Part V., above, GSEs typically issue GSE Bonds following a predictable, regular schedule.  Newly issued GSE Bonds of a given type are referred to as "on-the-run," and generally have similar features to existing "off-the-run" GSE Bonds except that they mature at a later date. The most recent off-the-run bonds are used a benchmark when pricing new issuances. Thus, the prices of new "on-the-run" GSE Bonds are closely correlated with the prices of "off-the-run" GSE Bonds with similar characteristics that have been previously issued.

118.    This correlation between the prices of off-the-run and on-the-run GSE Bonds with comparable features created an opportunity for Defendants' conspiracy to artificially increase the

price of newly issued GSE Bonds by inflating the market price of GSE Bonds with similar features that were about to go "off-the-run."

119.    The newly auctioned bond is priced off the formerly on-the-run bond. Higher prices for the formerly on-the-run bond would increase prices for the newly issued, replacement bond since the formerly on-the-run bond is used as a benchmark in pricing a new issue.  Therefore, inflated on-the-run bond prices on the day before they go off-the-run benefit underwriting dealers by increasing the price of the newly auction bond.

120.    For example, because most recent off-the-run bond is used as a benchmark to price new issuances, inflating the price of the relevant off-the-run bond would increase prices for the newly issued, replacement bond.  Therefore, inflated on-the-run bond prices on the day before they go off-the-run benefit underwriting dealers by increasing the price of the newly auction bond.

121.    Plaintiffs found evidence that this occurred Between 2009 and 2016. Specifically, Plaintiffs found that GSE Bonds about to go off-the-run consistently experienced a statistically significant price increase in the two days immediately leading up to a new issuance. This is the opposite of what is expected in a competitive market where demand for (and therefore the price of) GSE Bonds about to go off-the-run should be relatively low in the days leading up to a new issuance of GSE Bonds with similar features because investors would prefer to purchase on-the-run GSE Bonds from the new issuance. This is because the market for on-the-run GSE Bonds is generally more liquid (*i.e.*, larger transaction volume) than the market for off-the-run GSE Bonds. Investors prefer to invest in more liquid GSE Bonds because an investor has a higher likelihood of finding a buyer for these instruments at the market price should the investor decide to sell. Because demand is higher for on-the-run GSE Bonds than for off-the-run GSE Bonds, prices of

on-the-run GSE Bonds are generally higher and yields are lower.24

122.    Significantly, this observed price inflation in advance of new GSE Bond issuances dissipated after January 1, 2016, when prices of bonds that were about to go off-the-run traded at lower prices than newly issued GSE Bonds.

123.    Plaintiffs isolated Defendants' price inflation of Notes about to go off-the-run and account for any other potential macroeconomic factors by comparing the prices Defendants charged to their customers for these GSE Bonds and the prices that Defendants charged to each other for the same Notes. This comparison shows that the price inflation for Notes about to go off-the-run only occurred in transactions involving ***customers***. In otherwise identical transactions between the Defendants themselves, no price inflation occurred.

124.    For example, Plaintiffs examined the yield spreads on 55 different on-the-run GSE Bonds on the dates around the auction of a new, replacement on-the-run bond Between 2009 and 2016. In particular, they looked at the four different yield curves estimated by Market Axess based on enhanced TRACE data.25 For each of these calculations of yield spreads over treasury bonds, Plaintiffs found that the yield spreads did not behave as would be expected when GSE Bonds were replaced by newer on-the-run bonds.

125.    In fact, Plaintiffs found that dealers actually charged inflated prices to customers (both buyers and sellers) on the day before the new auction date. Statistically significant at the 95% level, the graph shows that inter-dealer prices (as represented by yield spreads)26 are substantially lower than prices dealers set for either purchases or sales by non-dealer customers.\

---

24 *See, e.g.*, U.S. Department of the Treasury, Treasury Notes, "Examining Liquidity in On- the-Run and Off-the-Run Treasury Securities" dated May 20, 2016; Federal Reserve Bank of New York Staff Reports, "An Index of Treasury Market Liquidity: 1991-2017," October 2017.
25 These four yield spreads are: (1) the Interpolated Spread or "I Spread"; (2) the Market Spread; (3) the Option Adjusted Spread or "OAS"; and (4) the par spread.  Each of these measures a bond's rate of return after controlling for various factors.
26 Note: More negative yield spreads correspond to lower yields and higher prices.

126.     Plaintiffs further looked at the prices of GSE Bonds over a three-day period surrounding the new issuance when the bond went "off-the-run." In a competitive market, a bond price would decrease and the bond yield would increase when the formerly on-the-run bond switched to the less liquid off-the-run market. Instead, Between 2009 and 2016, GSE Bond prices charged to non-dealer customers buying the formerly on-the-run bond were high on the day before the auction when the bond was still on-the-run. Further, prices continued to be high compared to inter-dealer prices over the three-day period surrounding the auction. This was true for each of the four different measures of yield spreads:

127.     Finally, Plaintiffs cross-checked the yield analyses with an analysis of the bid-ask spreads on dates around the shift in a GSE Bond's status from on-the-run to off-the-run. Yield spreads measure bond prices, whereas bid-ask spreads measure transaction costs and thus the profits earned by dealers for providing market making services in bond trading. As discussed in Part V., above, the less liquid the bond, the higher the bid-ask spread. Thus, it is a well-known characteristic that bid-ask spreads on off-the-run bonds are higher than for on-the-run bonds. However, Plaintiffs found that bid-ask spreads for formerly on-the-run bonds declined almost two basis points (statistically significantly at the 95% level) below other GSE Bonds on each of the three dates around the new auction of a replacement on-the-run bond. This atypical narrowing of bid-ask spreads for newly off-the-run bonds is consistent with dealer manipulation of GSE Bond prices around the new issue date.  In general, the lower the bid-ask spread, the greater the likelihood of transactions. Thus, narrower bid-ask spreads were used by dealers to encourage customer purchases of GSE bonds at inflated prices.

### 3.     Bid-Ask Spreads for GSE Bonds Were Artificially Widened

128.     Plaintiffs analyzed the bid-ask spreads quoted by dealers in the GSE Bond market

both before and after January 1, 2016.    This analysis yielded statistically significant results showing that bid-ask spreads were wider Between 2009 and 2016 as compared to the time period after 2016.

129.    These results were highly anomalous, and they are even more significant and unusual after analyzing the relationship between bid-ask spreads in the GSE Bond market to changes in liquidity (*i.e.*, GSE Bond transaction volume). For example, while bid-ask spreads in the GSE Bond market should have narrowed between 2009 and 2016 in response to increases in market liquidity caused by advances in electronic trading and transparency (following the introduction of TRACE), Approved GSE Dealers charged their customers materially *wider* bid-ask spreads in the GSE Bond market during this period.

130.    The direct relationship observed between liquidity and bid-ask spreads is the exact opposite of what is expected in a competitive market. However, it is entirely consistent with the direct evidence of Defendants' agreement not to compete for GSE Bond market activity in the secondary market. Plaintiffs' analysis shows that Defendants responded to greater liquidity by agreeing to maintain wider bid-ask spreads, thereby earning additional profits on each GSE Bond transaction with customers.

131.    Plaintiffs examined bid/ask spreads on GSE bonds and found that they were wider Between 2009 and 2016. Controlling for other corporate bond spreads and market volatility, Plaintiffs found that average bid/ask spreads increased by a statistically significant (at the 99% level) amount of 4.66 basis points Between 2009 and 2016, representing a 68% increase in average spreads.

132.    The effect of Defendants' conduct on bid-ask spreads can be further observed in the bid-ask spreads that Defendants quoted in "riskless principal" transactions.  A riskless principal

transaction is a trade where a dealer purchases a GSE Bond after it has already agreed to sell the GSE Bond to a customer or vice-versa, and therefore never bears any liquidity risk associated with carrying that GSE Bond. Therefore, the dealer can complete a round-trip transaction within seconds by simultaneously buying and selling the GSE Bond. Analyzing riskless principal transactions is useful for measuring the impact of Defendants' conspiracy on bid-ask quotes because these transactions are not impacted by market liquidity or other changes in market conditions.

133.    This analysis yields statistically significant results further confirming that Defendants quoted artificially wide bid-ask spreads for GSE Bonds to customers. Between March 1, 2010 and January 1, 2016, the average bid-ask spread for riskless principal GSE Bond transactions was 36.1 basis points. In the post-Time period between 2009 and 2016, bid-ask spreads in riskless principal GSE Bond transactions substantially decreased to an average of 16.7 basis points, as shown in Figure 5 below.  This represents an additional 116% in profits per transaction for Defendants prior to January 1, 2016 and corresponding overcharges paid by investors.

134.    Plaintiffs also analyzed all currently available GSE Bond quotes for which it was possible to identify the dealer who supplied the quote.[27] This dataset included more than 36 million GSE Bond quotes from January 1, 2009 through January 1, 2016, and more than 47 million quotes after January 1, 2016, including quotes from seven Defendants.[28] Plaintiffs removed the highest 5% of quotes and the lowest 5% of quotes from the sample. This process ensures that the results of the analysis are not skewed by outliers.

---

27 Generally, the identity of the dealer supplying a GSE Bond quote is removed from the data. For this analysis, Plaintiffs used all available quotes that identified the dealer supplying the quote.
28 Quotes could be attributed to the following seven Defendants: BCI, BNP Securities, Morgan Stanley, Goldman Sachs, JPMS, CS Securities, and SG Securities.

135.     Plaintiffs adjusted the spreads in the bid-ask quotes in the sample to account for differences in the notional amount of GSE Bonds quoted. This step ensures that differences in the notional value of the quoted GSE Bonds do not affect the analysis. The result is the "average relative bid-ask spread."

136.     Last, Plaintiffs compared the average relative bid-ask spreads in the quotes attributable to the Defendants Between 2009 and 2016 against the average relative bid-ask spreads in the quotes attributable to the Defendants after the Time period between 2009 and 2016.

137.     The results of this analysis were that the average relative bid- ask spread in Defendants' GSE Bond quotes was 35.4 basis points Between 2009 and 2016.  After the Time period between 2009 and 2016, the average relative bid-ask spread in Defendants' GSE Bond quotes drops to 18.6 basis points. Thus, the average relative bid-ask spread in Defendants' GSE Bond quotes Between 2009 and 2016, represented by the red bar, was ***90% wider*** than the average relative bid-ask spread in Defendants' GSE Bond quotes after the Time period between 2009 and 2016.

138.     The results described above indicate that Defendants were responsible for the artificially wide bid-ask spreads quoted to investors, including Plaintiffs, Between 2009 and 2016.

**E.     Defendants Failed to Adequately Supervise Their Trading and Sales Business Between 2009 and 2016**

139.     Defendants failed to properly train sales and trading staff on critical issues such as ethical behavior, the obligation to independently determine pricing, the distinction between lawful syndication activities and unlawful price-fixing in the secondary market, and the markets' reliance on Approved GSE Bond Dealers to determine fair and competitive GSE Bond prices. These failures have been well-documented by regulators who have found collusion among Defendants or their parent companies in multiple other financial markets Between 2009 and 2016,

as described in detail below.

140.     Defendants also invited misconduct among their GSE Bond sales and trading staff by creating conflicts of interest. For example, Defendants tasked the same individuals who participated in underwriting GSE Bonds with determining secondary market pricing. This created a conflict of interest because these traders book profits based on the difference between the price at which they purchased GSE Bonds from GSEs and the prices at which they sold GSE Bonds to investors. This lack of ethical walls also created an unfair advantage for Defendants' traders and sales staff because it allowed them to improperly leverage information gleaned from participating in the GSE Issuance Process (such as investor demand and a GSE's plans for issuing more GSE Bonds) to earn additional profits trading in the secondary market. This practice was so common in the GSE Bond market Between 2009 and 2016 that insiders gave GSE Bond trading desks that lacked such ethical walls a nickname, referring to them as "Casino Royale."

141.     Defendants' failure to supply proper training and supervision was especially egregious because they compensated their GSE Bond trading and sales staff primarily through variable compensation (*i.e.*, bonuses), based on both individual profits and the profitability of each respective bank's GSE Bond trading and sales business. Although individuals' compensation packages are a closely guarded secret, the practice of awarding variable compensation based solely on profits has been studied by observers such as the Brookings Institution.29  Alternative measures of performance, such as client service, ethical behavior, and adequate supervision of subordinates, did not factor into these compensation decisions.

142.     Defendants' prioritization of their own profits at the expense of lawful, ethical behavior is especially egregious in the GSE Bond market for several reasons. First, Defendants'

---

29 *See, e.g.*, Douglas J. Elliot, Brookings Institution, *Wall Street Pay: A Primer* (Jan. 11, 2010).

largest customers are institutional investors like Plaintiffs, many of which are state or municipal funds. These funds are often required to invest in relatively safe investments, such as GSE Bonds, because they are subject to strict mandates concerning the level of risk that they can assume in their investments. These customers depend on these investments to generate sufficient returns so that they can afford payments for beneficiaries and can finance critical public services.

143.    Second, Defendants serve as "price makers" in the GSE Bond market, which is both highly concentrated and opaque. *See* Part V., above. Accordingly, market participants like Plaintiffs must rely on Defendants as a source of information to determine competitive price levels for GSE Bonds so that they can make informed investment decisions. Despite their critical role in ensuring competitive pricing in the GSE Bond market, Defendants failed to make the necessary investments in compliance, ethics training, and supervision.

144.    Defendants engaged in multiple, similar price-fixing conspiracies in various financial markets Between 2009 and 2016 that led government investigators to find parallel deficiencies in oversight and control at Defendants' trading and sales businesses. These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

145.    These findings further support the conspiracy alleged in this Complaint because they demonstrate that each Defendant employed deficient compliance and oversight systems in their sales and trading businesses Between 2009 and 2016 and engaged in anti-competitive conduct across numerous financial markets.

146.    FX:    Multiple Defendants here failed to control or detect rampant misconduct amongst their trading staff in the foreign exchange market. These failures allowed traders to fix bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices,

and share confidential customer order information and proprietary information on trading positions with competitors in group chat rooms with names like "The Cartel."  Defendants' deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years Between 2009 and 2016.  The DOJ's Antitrust Division, the same regulatory office presently investigating Defendants' collusive conduct in the GSE Bond market, has obtained guilty pleas against the following corporate parents of Defendants in this case for failing to adequately monitor anticompetitive conduct in their subsidiaries' trading businesses: Citicorp. (a wholly owned, direct subsidiary of Citigroup Inc., the parent company of Defendant CGMI), Barclays PLC (the corporate parent of Defendant BCI), and JPMorgan Chase & Co. (the corporate parent of JPM NA and Defendant JPMS), for operating inadequate oversight measures that allowed trading and sales staff to engage in a years' long conspiracy to fix FX prices Between 2009 and 2016. Due to its conduct in the FX market, DOJ found UBS to be in breach of its non-prosecution agreement related to UBS's conduct in the setting of "IBOR" benchmark rates. The European Commission also recently imposed fines of over €1 billion on banks, including the corporate parents of Defendants JPMS, BCI, and CGMI for their anticompetitive conduct in the FX market. UBS was provided full immunity by the European Commission in exchange for providing information about the FX conspiracy. CS AG has also been charged with engaging in "anti-competitive practices" by the European Commission.  CS AG, Deutsche Bank AG ("DB AG"), and Goldman Sachs Group, Inc., the parent company of Goldman Sachs, have also entered into Consent Orders with the New York State Department of Financial Services regarding their anticompetitive conduct in the FX market. Regulatory fines against the banks totaled over $10 billion. Civil settlements thus far total over $2.3 billion.

      147.    LIBOR/Euribor/Yen LIBOR/Swiss franc LIBOR: Government investigations and

civil lawsuits have revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. Dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR) . Between 2009 and 2016. These investigations have led to fines of upwards of $9 billion and civil settlements over $500 million for price fixing by the following corporate parents of Defendants here who failed to detect and prevent anticompetitive conduct by trading and sales staff within their subsidiaries. Barclays PLC, Bank of America Corporation (the parent of BANA and Merrill Lynch), Deutsche Bank AG (the corporate parent of DBSI), UBS AG, JPMorgan Chase & Co., and Citigroup Inc have all been fined or plead guilty. Regulators found that trading staff within these banks engaged in widespread misconduct Between 2009 and 2016, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

148.   ISDAfix: Government regulators captured over $850 million in fines from banks, including DBSI, JPM NA, BNP Securities, BANA, Citibank, N.A. (a wholly owned subsidiary of Defendant Citigroup Inc.), Goldman Sachs, and BCI, for operating deficient compliance and oversight functions that allowed traders to systematically manipulate the U.S. dollar ISDAfix benchmark Between 2009 and 2016 to boost trading profits. Civil settlements in the case totaled over $500 million.

149.   SSA Bonds: A DOJ investigation into price-fixing in the sub-sovereign and supranational agency ("SSA") bond market became public in December of 2015. It quickly prompted simultaneous cartel investigations by the UK Financial Conduct Authority, the European Commission, and the filing of private lawsuits. The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks (originally filed against five) and hundreds of redacted chats and transcripts that demonstrated that these banks failed to oversee collusive

communications by trading and sales staffs in their bond businesses. In August 2017, Deutsche Bank AG and Bank of America Corp. agreed to settle for a total of $65.5 million. In January 2019, HSBC Holdings Plc agreed to pay $30 million to settle the claims.

150.   Mexican Government Bonds: The Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced in April 2017 that it uncovered evidence of anticompetitive conduct among dealers in the Mexican Government Bond market, including subsidiaries of Citigroup Inc., JPMorgan Chase & Co., and Bank of America Corp. At least one bank was accepted into its cartel leniency program after admitting to participation in a conspiracy to fix Mexican Government Bond prices.

151.   Swiss Franc Interest Rate Derivatives: The European Commission fined UBS AG, JPMorgan Chase & Co., and CS AG a total of €32.3 million euros for conspiring to fix bid-ask spreads in the market for interest rate derivatives denominated in Swiss francs. The Swiss franc interest rate derivatives conspiracy operated similarly to the conspiracy alleged in this Complaint and involved an agreement among horizontal competitors in the OTC market for derivatives to charge inflated bid-ask spreads to customers. These parent companies of Defendants failed to detect and deter collusive communications among traders at these banks.

152.   Stifel, Nicolaus & Co. - SEC charged the St. Louis-based brokerage firm and a former senior executive with defrauding five Wisconsin school districts by selling them unsuitably risky and complex investments. (8/10/11).

## VII.  ANTITRUST INJURY

153.   Plaintiff City of Baton Rouge and CPERS are domestic consumers of GSE Bonds. They purchased and sold billions of dollars' worth of GSE Bonds in the United States Between 2009 and 2016, doing so directly with each Defendant.

154.    As described above, Defendants fixed the prices of GSE Bonds Between 2009 and 2016 for their own profit.  Additional Defendants, J. P. Morgan, Wells Fargo, Stifel,  Morgan Keegan, Capital One, Raymond James, Bank of New York and Banc of America Securities also participated in this conspiracy through the brokerage of bonds whose prices had been fixed by other defendants, and by also participating in the fixing of prices of bonds sold to the Plaintiff.

155.    As a direct result of Defendants' misconduct, Plaintiffs were overcharged each time they purchased GSE Bonds from Defendants and underpaid each time they sold GSE Bonds to Defendants. Thus, as set forth in more detail below, Plaintiffs were injured and suffered harm in each GSE Bond transaction conducted Between 2009 and 2016.

156.    **City of Baton Rouge and CPERS:** The City of Baton Rouge and CPERS transacted billions of dollars' worth of GSE Bonds in the United States Between 2009 and 2016 directly with Defendants Bank of America, Barclays, UBS, Citigroup, Deutsche Bank, Credit Suisse, FTN Financial, JP Morgan, Morgan Keegan, Morgan Stanley, RBS, Stifel Nicolaus and Co., Wells Fargo, Capital One, and Morgan Keegan. These transactions were entered at artificial prices directly caused by Defendants' conspiracy.  For example, the following transactions involve purchases of GSE Bonds which have been identified as among those whose FTT prices Defendants agreed to fix between 2009 and 2016:

a)  $414,000,000.00 purchases of FHLMC, FNMA, and FHLB fixed rate securities from Stifel Nicolaus, JP Morgan, Capital One, and Morgan Keegan

b)  $342,075,000.00 purchases of FHLMC, FNMA and FHLB fixed rate securities from Stifel, Wells Fargo, Capital One and Morgan Keegan.

157.    As demonstrated by the allegations of this Complaint, the chat room Defendants conspired to inflate the FTT prices prior to selling GSE Bonds in the secondary market. As a result,

The City of Baton Rouge and CPERS entered at least those transactions listed above at artificially inflated prices, suffering monetary losses and antitrust injuries, when they paid more for these GSE Bonds than they should have between 2009 and 2016.

158.    In addition, and as a direct result of Defendants' misconduct, The City of Baton Rouge and CPERS was overcharged each time they purchased GSE Bonds from Defendants and underpaid each time they sold GSE Bonds to Defendants. Thus, as set forth in more detail  below, The City of Baton Rouge and CPERS was injured and suffered harm in each GSE Bond transaction conducted between 2009 and 2016.

159.    The City of Baton Rouge and CPERS' GSE Bond transactions include purchases of newly issued GSE Bonds in the week following GSE Bond issuances, and purchases and sales with Defendants at artificial bid and ask prices that Defendants agreed to charge customers Between 2009 and 2016. Accordingly, the City of Baton Rouge and CPERS was injured when it paid more in GSE Bond purchases and received less in GSE Bond sales with Defendants between 2009 and 2016 as a direct result of Defendants' conspiracy. *See* Part VI.D.1.-3., above.

160.    For example, the City of Baton Rouge and CPERS purchased GSE Bonds from JP Morgan, Wells Fargo, Stifel, Bank of New York Banc of America Securities between July 1, 2010 and June 30, 2013.  Between 2009 and 2016, JP Morgan participated in a conspiracy to fix prices in the GSE Bond market, which included charging artificially inflated prices for newly issued GSE Bonds. *See* Part VI.D.1., above. Accordingly, the City of Baton Rouge and CPERS was injured when it paid more than it should have for GSE Bonds it bought from JP Morgan.  The City of Baton Rouge and CPERS made numerous additional GSE Bond purchases from Defendants on offer days or in the week after GSE Bond issuances throughout the Time period between 2009 and 2016. Examples of these purchases are as follows:  In 2010, Bank of

America/Merrill Lynch, d/b/a "Banc of America Securities" sold the plaintiff over $150,000,000 in price fixed bonds from FHLB, FNMA and FHLMC.  In 2011 the amounts of bonds sold to the Plaintiff which were sold at an inflated price as a result of the price fixing scheme as alleged herein, included the following: J.P. Morgan sold $45,900,883.34 (FHLMC), Morgan Keegan sold $24,924,166.67(all FHLMC) ; Stifel Nicolaus and Co., sold  $167,810,551.98 (FHLMC, FHLB, and FNMA), Capital One sold approximately, $49,000,000  ( FNMA, FHLB, FHLMC).  In 2013 Wells Fargo sold the Plaintiff $160,312,785.77 (FHLMC and FNMA).  All the bonds listed above were sold at supra-competitive prices at par values consistent with the pleadings as and the scheme as outlined herein.

161.    The City of Baton Rouge and CPERS also suffered injury by paying artificially higher prices when buying GSE Bonds, and receiving artificially lower prices when selling GSE Bonds, as a result of Defendants' agreement to maintain artificially wide bid-ask spreads.

162.    For example, the City of Baton Rouge and CPERS sold GSE Bonds to all Defendants between 2009 and 2016.  These bonds included those issued by Fannie Mae Freddie Mac and the Federal Home Loan Bank on dates subsequent to the date which they were sold to the Defendants.   The Plaintiff avers that based upon the foregoing allegations in this complaint, all Defendants to whom which bonds were sold participated in a conspiracy to fix GSE Bond prices between 2009 and 2016, including by agreeing to maintain artificially wide bid-ask spreads. *See* Part VI.D.3.,  above. Accordingly, The City of Baton Rouge and CPERS was injured when it received less than it should have for GSE Bonds it sold to the Defendants between 2009 and 2016.

## VIII.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

163.    The statutes of limitations governing Plaintiffs' claims were tolled under the doctrine of fraudulent concealment until at least June 2018, when it was revealed that the DOJ

Antitrust Division was investigating price-fixing in the market for GSE Bonds. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

164.    Defendants and their co-conspirators actively concealed their violations of law from Plaintiffs and the Class by, *inter alia*, (i) relying on non-public forms of communication, such as private electronic messages and telephone calls; (ii) implicitly representing that the GSE Bond pricing quotes Defendants supplied to Plaintiffs and the Class were the product of honest competition and not fixed by a conspiracy; and (iii) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws. Below is a list of non-exhaustive examples of such statements that Defendants published Between 2009 and 2016:

(a) Barclays PLC, reporting on behalf of BCI, reported in its 2010 Annual Report that it "operate[s] a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations." Barclays PLC claimed that it "acknowledges that free and fair competition is good for business and customers and clients, driving innovation and improvements in service provision."

(b) Bank of America Corporation, reporting on behalf of Merrill Lynch, wrote in its 2010 Annual Report that it operated a program "consistently applied across the Corporation . . . to manage compliance risk." It also reported that it maintained an independent "Corporate Audit function" to "provide reasonable assurance" that "employees' actions are in compliance with . . . applicable laws and regulations." It further claimed that it emphasized a "culture of compliance" across the organization, including at Merrill Lynch.

(c) Citigroup Inc. implemented a "Citi Code of Conduct" during and after the Time period between 2009 and 2016. The Citi Code of Conduct applied to all entities affiliated with Citigroup Inc., including CGMI, and stated that Citigroup Inc. and its affiliates were "committed to promoting free and competitive markets." In its 2010 Annual Report, Citigroup Inc. claimed that it "monitor[ed] and control[led]" employee conduct, which included employees of CGMI, through "compliance and legal reporting systems, internal controls, management review processes and other mechanisms."

(d) Credit Suisse Group AG, reporting on behalf of CS Securities, boasted that it had developed a "strong compliance culture" Between 2009 and 2016. It wrote in its 2010 Annual Report that it continued to "proactive[ly] develop[] [its] compliance framework [to] position[ it] well to respond to evolving regulation in the markets in which [it] operate[s]." Credit Suisse Group AG also emphasized that its "compensations practices and plans . . . are consistent with and promote effective risk management practices as well as [its] compliance and control culture." It published an updated Code of Conduct in 2010 "to place a greater emphasis on the values and professional standards underpinning [its] control and compliance."

(e) DB AG, which reports on behalf of Defendant DBSI, wrote in its 2010 Annual Report that it maintained a "Regional Management" group responsible for both local and corporate-wide "compliance with regulatory and control requirements." DB AG also represented that it was "in compliance with the German laws that are applicable to [its] business in all

material aspects." Price-fixing agreements among horizontal competitors are prohibited under German law.

(f) Goldman Sachs Group Inc., which reports on behalf of Goldman Sachs, wrote in its 2010 Annual Report that it "monitor[s] and control[s] [its] risk exposure through a risk and control framework encompassing a variety of separate but complementary financial, credit, operational, compliance and legal reporting systems, internal controls, management review processes and other mechanisms." Goldman Sachs Group Inc. further claimed that "compliance with the law is the minimum standard to which we hold ourselves." Goldman Sachs Group Inc. also published a Code of Conduct Between 2009 and 2016 that purportedly required "fair and ethical competition" by its employees, including employees of Goldman Sachs, and prohibited "manipulation" and "unfair dealing practice[s]."

(g) JPMorgan Chase & Co. published a "Code of Conduct" Between 2009 and 2016 that applied to "all its direct and indirect subsidiaries." In the Code of Conduct, JPMorgan Chase & Co. claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business." JPMorgan Chase & Co., which reports on behalf of JPM NA and JPMS, reported in its 2010 Annual Report that its Audit Committee "reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes." It further assured investors that it "has established policies and procedures, and has in place various oversight

functions, intended to promote the Firm's culture of 'doing the right thing.'"

(h) First Tennessee and FTN Financial reported under First Horizon's 2010 Annual Report that First Horizon had "[m]anagement processes, structure, and policies [which] are designed to help ensure compliance with laws and regulations as well as provide organizational clarity for authority, decision-making, and accountability." First Horizon also reported having a risk management team that "monitor[s] business practices in relation to those [established appropriate operating] standards." It also wrote in its Code of Conduct that it prohibited "manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice."

(i) BNP Paribas SA, which reports on behalf of subsidiaries including BNP Securities, wrote in its 2010 Annual Report that it had in place a "complex internal control governance structure involving the Board of Directors, through various Committees," to purportedly ensure an effective internal compliance system. BNP Paribas SA published a 2011 Code of Conduct where it wrote that it prohibited "market manipulation" and required "natural[] compl[iance] with the laws, regulations and professional standards" from its employees, including employees of BNP Securities.

(j) UBS AG, which reports on behalf of UBS Securities, boasted in its 2010 Annual Report that it "pursue[s] the highest levels of compliance through extensive employee training and investment in risk management processes and standards." Additionally, it emphasized that it evaluated its employees

"base[d]" in part on "whether they . . . operate with a high level of integrity and in compliance with UBS policies." UBS Securities also claimed in its global Code of Business Conduct and Ethics that it was "committed to . . . complying with relevant laws, rules and regulations, including applicable antitrust and competition laws."

(k)  Morgan Stanley, which reports on behalf of MS&Co., wrote in its 2010 Annual Report that it "has established procedures based on legal and regulatory requirements on a worldwide basis that are designed to foster compliance with applicable statutory and regulatory requirements. In addition, Morgan Stanley has and continuously develops various procedures addressing such issues as . . . sales and trading practices "Morgan Stanley wrote in its 2013 Code of Ethics and Business Conduct that it "seek[s] to outperform our competition fairly and honestly through superior performance. . . .No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information or misrepresentation of facts."

(l)  The Toronto-Dominion Bank, which reports on behalf of TD Securities, wrote in its 2010 Code of Conduct and Ethics "that concern for what is right, including compliance with the law, should be the first consideration in all business decisions and actions."

(m) Nomura Holdings, Inc., which reports on behalf of Nomura Securities, wrote in its 2010 Annual Report that it was "striving to strengthen and improve its internal control system in order to promote proper corporate behavior

throughout the [Nomura] Group from the viewpoints of . . . complying with laws and regulations [and] controlling risks. . .”; and that it “works to prevent behavior that may give rise to suspicion of violations of legal regulations.”

165.    Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation and the conduct took place in private electronic chat rooms. Had the public learned that Defendants conspired to fix prices in the GSE Bond market, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiffs could not have learned of Defendants' anticompetitive conduct prior to June 2018, when confidential sources revealed that the DOJ Antitrust Division was investigating dealers for fixing the prices of GSE Bonds purchased and sold by investors.

166.    Because of Defendants' fraudulent concealment, the City of Baton Rouge and CPERS was not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until June 2018, when the DOJ's price-fixing investigation was revealed publicly for the first time. Accordingly, Plaintiffs assert that the applicable statutes of limitations on Plaintiffs' claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

### Professional Negligence Claims against Defendant Wells Fargo, Morgan Keegan ( dba Raymond James), Capital One and Stifel Nicolaus and Co., Inc.

167.    The Defendant Stifel Nicolaus is a broker/dealer of Fixed Rate Securities issued by Fannie Mae and/or Freddie Mac. Between July 1, 2012 and June 30, 2013 this defendant entered into contracts with the City of Baton Rouge, CPERS, and/or the Police Guaranty Fund to broker the purchase of FFB securities with a face value of $530,000,000.00. Each of these securities were purchased at supra competitive prices and were inflated in in price as a result of the conspiracy of the "chat room " defendants as outlined in this complaint.

168.     Between July 1, 2009 and January 1, 2016, Defendant Capital One entered into contracts with the City of Baton Rouge, CPERS and/or the Police Guaranty Fund to broker the purchase of FFB securities in the face amount of more than $375,000,000.00.  Each of these securities were purchased at supra-competitive prices and were inflated in price as a result of the conspiracy of the "chat room" defendants as outlined in this complaint.

169.     Between July 1, 2009 and December 31, 2016, Defendant, Wells Fargo entered into contracts with the City of Baton Rouge, CPERS and/or the Police Guaranty Fund to broker the purchase of fixed rate securities with a face value amount of $40,000,000.00.  Each of these securities were purchased at supra-competitive prices and were inflated in price as a result of the conspiracy of the "chat room" defendants as outlined in this complaint.

170.     Between July 1, 2010 and June 30, 2011, Defendant, Morgan Keegan, entered into contracts with the State of Louisiana to broker the purchase of fixed rate securities with a face value amount of $50,000,000.00.  It also entered into contracts for the sale of said securities between July 1, 2012 and June 30, 2013 in the face value amount of $22,000,000.00.  Each of these securities were purchased or sold at supra-competitive prices and were inflated in price in the purchase phase of the transactions and deflated in price in the sale phase of the transactions as a result of the conspiracy of the "chat room" defendants as outlined in this complaint.

171.     In each instance, as broker-dealers of these securities, each Defendant, Stifel Nicolaus and Co., Wells Fargo Bank, N.A., Capital one and Morgan Keegan, dba Raymond James, owed a duty of care to their customers, including the City of Baton Rouge, CPERS, and the Police Guaranty Fund.  Those duties include a duty to ensure that the investments that they offered or brokered were suitable for the Plaintiffs as a client, and a duty to use reasonable care in recommending investments to the Plaintiffs.  This duty of reasonable care includes a duty to avoid

unreasonable behavior which puts a client at risk of financial harm and a duty to avoid recommending investments which it knew or should have known would constitute a fraud or a scam.

172.    Between July 1, 2009 and June 30, 2016, the City of Baton Rouge, CPERS and the Police Guaranty Fund  entered into contracts to purchase more than 100 fixed rate FNMA and FHLMC securities based upon the recommendations from Defendant, Stifel Nicholas, Wells Fargo Bank, N.A., Capital One and Morgan Keegan, in face value amount that in total exceed $1,500,000,000.00.  At all times therein all of these named defendants, Stifel Nicolaus, Wells Fargo, Capital One and Morgan Keegan  acted as brokers for these transactions.  Previous to the date of the consummation of these transactions, all Defendants have marketed themselves as a securities broker to the Plaintiffs, and have made affirmations regarding their expertise in this area.

173.    Stifel has made specific affirmations to the Plaintiffs as well as all of their institutional clients regarding their expertise, and touted their skill in advising clients.  On their website even today, Stifel makes the following statements regarding their process and expertise in recommending investments:

### Delivering results through deep industry experience and an integrated, collaborative approach.

At Stifel, our mission is to provide the professional guidance and resources you need to work toward your goals.

Whether you're a corporation or business, government entity, nonprofit, or institutional investor, we start with a simple, straightforward approach: We talk with you and members of your team. We listen to you. And then we work directly with you to move your plan forward.

It's the same approach we've been using for more than 125 years. From raising capital to underwriting municipal projects, and everything in between, solid, studied advice has been the hallmark of Stifel's approach.

We're ready to help your organization.30

174.     Defendant Wells Fargo touts itself as a "leader" in capital markets

**A customer-centric leader in capital markets**

Wells Fargo offers a customer-centric approach to our capital markets services. We work with you to meet your investment and execution needs and offer a full spectrum of fixed income products.

Our experienced sales and trading teams are dedicated to providing superior customer service and support. We focus on quick response times, helping our clients be efficient, and offer fair and reasonable prices.

Whether your trading needs are electronic or high-touch, we can help you execute, enhance liquidity, and manage risk through our broad product and service offering and operational efficiency.31

It touts its experience through its "research and investment team" advertised on its website, and

has offered its "skill and experience" as the number one leading underwriting in U.S. Agency

Securities.32

175.     Additionally, Defendant Capital One touts the skill and experience of their firm:

[we have] decades of experience successfully completing deals across energy, real estate and other industries.

Build relationships with a team of industry experts. Capital One Securities, Inc. is a broker dealer providing investment banking, equity research and institutional sales. We also offer equity trading services on an agency basis for institutional investors, distribution of at-the-market offerings and corporate stock buyback capabilities.

Since being acquired by Capital One® in 2005, we have participated in more than $500 billion in capital markets transactions. Our Energy and Real Estate Investment Trusts (REIT) investment banking professionals bring decades of combined industry experience to clients across the country.

Backed by a top-tier institutional sales team, we also have extensive experience in equity research. Our research coverage includes approximately 120 exploration and production oilfield services and midstream energy companies, as well as team coverage on more than 30 REITs across 6 asset classes.33

---

30 https://www.stifel.com/institutional
31 https://www.wellsfargo.com/com/securities/markets/fixed-income/
32 https://www.wellsfargo.com/com/securities/markets/fixed-income/fixed-income-products/
33 https://www.capitalone.com/commercial/securities/

176.    Defendant Morgan Keegan, dba Raymond James, also touts its experience in recommending investments to its clients.  It states in its publicly available information that "…Our advisors have the freedom to recommend only what they think makes the most sense for each client in building a diversified investment portfolio designed for your specific objectives. And those recommendations are powered by the expertise of our industry-leading research…" 34

177.    The Plaintiffs, as customers of Wells Fargo, Capital One, Morgan Keegan, and Stifel Nicolaus Co.,  relied upon statements such as these made by these defendants, which touted their skill expertise and experience, when it awarded them contracts to sell securities to the City of Baton Rouge.   It also relied upon the skill and expertise claimed by these selfsame defendants in the selection of the securities purchased in transactions brokered by these companies.

178.    The Defendants violated the duty of care owed to the Plaintiff by selling agency securities to the Plaintiffs which were in fact, the subject of a fraud of scam;  i.e., the unlawful price fixing scheme of the remaining "chat room" defendants. Specifically, each of these defendants recommended these securities to the Plaintiff, and the Plaintiff relied upon these recommendations and offerings from the Defendant.

179.    The Plaintiff would further aver that each of the Defendants in the use of their "skill and experience" knew or should have known that the bid-ask spreads were artificially widened between 2009 and 2016; that the prices were artificially higher for newly issued GSE bonds; and that the prices for most recently issued GSE bonds were increased in the days before each new issuance, indicating to a "skilled and experienced" brokers such as Stifel Nicolaus & Co., Wells Fargo, Morgan Keegan/Raymond James or Capital One,  that the prices were being subjected to artificial price fixing.  The Defendants therefore failed to use the degree of skill and experience

---

34 https://www.raymondjames.com/wealth-management/advice-products-and-services/investment-solutions

that they touted to the Plaintiff or which should have exercised by a broker acting with reasonable care and experience in recommending these investments. Finally, the FFB investments brokered by these defendants were sold a supra competitive prices to the Plaintiffs, and while those prices were advantageous to the commissions paid to the Defendants, it rendered these investments unsuitable for the State of Louisiana, as the return on these investments was impaired due to the pricing, which these experienced defendants should have recognized.

180.    As a result of each of the failures of each of the Defendants, Wells Fargo, Capital One, Stifel Nicolaus and Co., and Morgan Keegan, dba Raymond James to use reasonable skill and experience as brokers, ( as each is required to do to discharge their duty of care), the Plaintiffs have has suffered damages, to-wit, the loss of revenue from the selling and buying of bonds brokered by all these named Defendants.

181.    The Plaintiffs did not and could not discovery the existence of this claim for negligence against these broker defendants due to the acts of the other defendants, who directly participated in the chat room activities which were concealed from the Plaintiff. These Defendants' actions, concealed in chat rooms to which the Plaintiff had no access, concealed the nature of the price fixing, and thereby hid the existence of the causes of action against these broker defendants. Specifically, as noted herein, these defendants touted their experience, skill and knowledge to the Plaintiffs in selecting these bonds for purchase. These defendants likewise should have possessed the experience skill and knowledge to know that these chat rooms existed, that prices to these bonds were being fixed by the other defendants, and that information should have been disclosed to the Plaintiff. At no time has there been ANY disclosure of the chat room fraud by any of the broker defendants to the Plaintiffs. The Plaintiffs would aver that they were

put on notice as to this claim after the filing of a similar suit by the State of Louisiana against other defendants and as such this claim has been timely filed.

### Broker Defendants Are Liable under the Louisiana
### Unfair Trade Practices and Consumer Protection Act

182.    Under the laws of the State of Louisiana, the City of Baton Rouge can prosecute on its behalf any claims authorized under LUTPA. Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. R.S. 51:1401, et seq. See LSA-R.S. 51:1404.[2] Abbott, 208 So.3d at 388-89.

183.    Wells Fargo, Capital One, Stifel Nicolaus and Co, and Morgan Keegan, dba Raymond James, all sold FFBs to the City of Baton Rouge and its component unites between 2009 and 2016.

184.    The Plaintiff specifically states that each of these defendants engaged in deceptive business practices regarding the advertisement of their brokerage services, including making false statement regarding the use of their experience and skill in recommending investments.

185.    These Defendants as a result of these false statements, sold securities at supra competitive prices to Baton Rouge and its component units, and made no effort to use their advertised skill and experience to vet these transactions.

186.    As a result, the Plaintiff, Baton Rouge has suffered damages, including but not limited to, paying higher than normal prices for fixed rate securities when they were purchased or receiving far less than it should have received when said securities were sold.

187.    This combination of inducing clients to use their services and using advertising mediums to tout their skill and experience is a deceptive practice, in that these defendants undertook no effort at all to ascertain the suitability of their offered services, and took no actions

to ascertain the reason for the supra-competitive prices the Plaintiff ultimately paid for the investments brokered by them.

188.    As a result of the conduct of the aforementioned Defendants and pursuant to Louisiana Revised Statutes 51:1408, the City of Baton Rouge seeks payment of all damages incurred and all remedies allowed pursuant to LUPTA, which include but are not limited to the following:

(1) An order compensating the City of Baton Rouge for any monetary damages suffered;
(2) Revocation, forfeiture, or suspension of any license, charter, franchise, certificate, or other evidence of authority of any person to do business in the state.
(3) Appointment of a receiver.
(4) Dissolution of domestic corporations or associations.
(5) Suspension or termination of the right of aforementioned foreign corporations or associations to do business in this state.

## IX. CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*)
### (Against All Defendants)

189.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

190.    Defendants and their co-conspirators engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

191.    Between 2009 and 2016, Defendants controlled the supply of GSE Bonds available to investors and were horizontal competitors in the GSE Bond market.

192.    The combination and conspiracy consisted of a continuing agreement, understanding, and concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and charged artificial prices for GSE Bonds to investors. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any

event, an unreasonable and unlawful restraint of trade.

*193.* Defendants' conspiracy and resulting impact on GSE Bond prices paid by investors occurred in and affected U.S. interstate commerce.

*194.* As a proximate result of Defendants' unlawful conduct, the City of Baton Rouge and CPERS have suffered injury to their business or property. These injuries included, but were not limited to, paying artificial and non-competitive prices for GSE Bonds as a proximate result of Defendants' anticompetitive conduct. Plaintiffs and the Class were also deprived of the benefits of free and open competition in the GSE Bond market.

*195.* Plaintiffs and the City of Baton Rouge and CPERS are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## X.   PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

B.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

C.    For a judgment awarding Plaintiff damages against Defendants for Defendants' violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

D.    For an award to Plaintiff of its costs of suit, including reasonable attorneys' and experts' fees and expenses;

E.      For an order enjoining Defendants from engaging in further anticompetitive conduct in the GSE Bond market so that public confidence in this market can be restored; and

F.      For such other and further relief as the Court may deem just and proper.

## XI.   DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

### RESPECTFULLY SUBMITTED,

JOHNSON & JOHNSON, P.L.L.C.              BROUSSARD BALONEY LAW FIRM


 _/s/Curtis D. Johnson, Jr._              _/s/Geri Broussard Baloney_
CURTIS D. JOHNSON, JR.  (TN Bar No.015518)   GERI BROUSSARD BALONEY
Suite 1002, 1407 Union Avenue              3852 Napoleon Avenue
Memphis, Tennessee  38104                  New Orleans, LA  70125
Telephone:  (901) 725-7520                 Telephone:  (504) 294-4817
Facsimile:  (901) 725-7570                 gbroussard@bblf.com
cjohnson@johnsonandjohnsonattys.com


HAMMOND SILLS ADKINS & GUICE              THE CONNOR GROUP, LLC



/s/Alejandro R. Perkins                    _/s/Karl Connor_
ALEJANDRO R. PERKINS  La. Bar No. 30288    KARL CONNOR La. Bar No. 23454
HAMMONDS, SILLS, ADKINS & GUICE            2218 Napoleon Avenue
2431 South Acadian Thruway, Suite 600      New Orleans, LA  70115
Baton Rouge, LA 70808                      Tele: (504)521-6938
Telephone: 1(225)923-3462                  karl.connor@smartcounsel.net
Facsimile: 1(225)923-0315
aperkins@hamsil.com